Slip Op. 16-33

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TRI UNION FROZEN PRODUCTS, INC. ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Consol. Court No. 14-00249** |
| **Defendant,** | **Public Version** |
| **and** | |
| **AD HOC SHRIMP TRADE ACTION COMMITTEE,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Granting Defendant's request for voluntary remand for the U.S. Department of Commerce to reconsider its reliance on certain data to value labor and sustaining all other aspects of the final determination in the eighth administrative review of the antidumping duty order covering certain frozen warmwater shrimp from Vietnam.]

Dated: April 6, 2016

Jonathan Michael Freed, Trade Pacific, PLLC, of Washington DC argued for Plaintiffs Tri Union Frozen Products, Inc., Mazzetta Company LLC, Ore-Cal Corporation, and Consolidated Plaintiff Quoc Viet Seaproducts Processing Trading and Import-Export Co., Ltd. With him on the brief was Robert George Gosselink.

William Henry Barringer and Matthew Paul McCullough, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington DC argued for Consolidated Plaintiffs Vietnam Association of Seafood Exporters and Producers and certain of its individual member companies. With them on the brief were, Claudia Denise Hartleben, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington DC, Alexandra Bradley Hess and Matthew Robert Nicely, Hughes Hubbard & Reed LLP, of Washington DC.

Nathaniel Jude Maandig Rickard, Picard, Kentz & Rowe, LLP, of Washington DC argued for Consolidated Plaintiff and Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

Joshua Ethan Kurland, Trial Attorney, and Kara Marie Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, argued for Defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of Counsel on the brief was Mykhaylo Alexander Gryzlov, Senior Attorney, Office of the Chief Counsel for Trade and Compliance, U.S. Department of Justice, of Washington DC.

Kelly, Judge:  This consolidated action comes before the court on USCIT Rule 56.2 motions for judgment on the agency record, challenging the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the eighth administrative review of the antidumping duty order covering certain frozen warmwater shrimp[1] from the Socialist Republic of Vietnam ("Vietnam") for the period of February 1, 2012 through January 31, 2013.  See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam, 79 Fed. Reg. 57,047 (Dep't Commerce Sept. 24, 2014) (final results of antidumping duty administrative review, 2012–2013) ("Final Results"), as amended, 79 Fed. Reg. 65,377 (Dep't Commerce Nov. 4, 2014) (amended final results of antidumping duty administrative review, 2012–2013) ("Amended Final Results"), and accompanying Issues and Decision Memorandum for the Final Results of Certain Frozen

---

[1] The merchandise subject to the antidumping duty order include "certain warmwater shrimp and prawns, whether frozen, wild-caught (ocean harvested) or farm-raised (produced by aquaculture, head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. . . . The frozen warmwater shrimp and prawn products included . . . are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.  The products . . . may be processed from any species of warmwater shrimp and prawns."  See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam, 70 Fed. Reg. 5,152, 5,155 (Dep't Commerce Feb. 1, 2005) (notice of amended final determination of sales at less than fair value and antidumping duty order).

Warmwater Shrimp from the Socialist Republic of Vietnam, A-552-802, (Sept. 19, 2014),

available at http://enforcement.trade.gov/frn/summary/vietnam/2014-22732-1.pdf (last

visited Mar. 28, 2016) ("Final I&D Memo"); see also Certain Frozen Warmwater Shrimp

From the Socialist Republic of Vietnam, 70 Fed. Reg. 5,152 (Dep't Commerce Feb. 1,

2005) (notice of amended final determination of sales at less than fair value and

antidumping duty order) ("ADD Order").

Plaintiffs Tri Union Frozen Products, Inc., d/b/a Chicken of the Sea Frozen Foods,

a/k/a Empress International Ltd.; Mazzetta Company LLC; and Ore-Cal Corporation

(collectively "Tri Union"), importers of subject merchandise, commenced this action

pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a

(2012).[2]  The court consolidated Tri Union's action with actions filed by Consolidated

Plaintiffs Vietnamese Association of Seafood Exporters and Producers and certain of its

individual member companies, Vietnamese producers and exporters of subject

merchandise (collectively "VASEP"); Quoc Viet Seaproducts Processing Trading and

Import-Export Co., Ltd. ("Quoc Viet"), a Vietnamese producer and exporter of subject

merchandise; and Ad Hoc Shrimp Trade Action Committee ("Ad Hoc Shrimp"), an

association of domestic producers of warmwater shrimp.  See Order, Dec. 15, 2014, ECF

No. 29.  In addition to the Rule 56.2 motions for judgment on the agency record filed by

the above named parties, Ad Hoc Shrimp filed a response as a defendant-intervenor in

opposition to the motions filed by Quoc Viet and VASEP.  For the reasons set forth below,

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition, unless specified otherwise.

Defendant's request for voluntary remand for Commerce is granted and Commerce's Final Results and Amended Final Results are sustained in all other respects.

## BACKGROUND

Commerce issued the antidumping duty order covering certain frozen warmwater shrimp from Vietnam on February 1, 2005.  See generally ADD Order, 70 Fed. Reg. 5,152.  On March 29, 2013, pursuant to requests from several companies, including Ad Hoc Shrimp and Quoc Viet, Commerce initiated the eighth administrative review of the ADD Order for the period of February 1, 2012 through January 31, 2013.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 78 Fed. Reg. 19,197, 19,198–204 (Dep't Commerce Mar. 29, 2013); see also Ad Hoc Shrimp Request for Administrative Reviews at 1–2, PD 2 at bar code 3120960-01 (Feb. 26, 2013); Quoc Viet Request for Administrative Review and Request for Voluntary Treatment at 1, PD 1 at bar code 3117246-01 (Feb. 1, 2013) ("Quoc Viet Request").

Due to the large number of companies, Commerce found, pursuant to 19 U.S.C. § 1677f-1(c)(2), that it was not practicable to examine all foreign producers and exporters of subject merchandise and instead selected two companies that, according to U.S. Customs and Border Protection import data, accounted for the largest U.S. import entry volume of subject merchandise during the period of review to serve as mandatory respondents—(1) Minh Phu Group ("MPG"); and (2) Soc Trang Seafood Joint Stock Company ("Stapimex").  See Selection of Respondents for Individual Examination Memo at 1–2, 6–8, PD 40 at bar code 3137221-01 (May 24, 2013) ("Respondent Selection

Mem."); see also 19 U.S.C. § 1677f-1(c)(2)(B); Decision Memorandum for Preliminary

Results of Antidumping Duty Administrative Review: Certain Frozen Warmwater Shrimp

from the Socialist Republic of Vietnam at 1–3, A-552-802, (Mar. 18, 2014), available at

http://enforcement.trade.gov/frn/summary/vietnam/2014-06397-1.pdf (last visited Mar.

28, 2016) ("Prelim. I&D Memo").  Quoc Viet, as part of its request for Commerce to initiate

the administrative review, requested to be examined as a voluntary respondent if

Commerce decided to limit the review to individually examine particular exporters

pursuant to 19 U.S.C. § 1677f-1(c).  See Quoc Viet Request at 2.  Based on the

circumstances of the review, Commerce denied Quoc Viet's request finding that it would

be unduly burdensome and inhibit the timely completion of the review to individually

examine any additional respondents.  See Selection of Voluntary Respondent Memo at

1–4, PD 122 at bar code 3146779-01 (July 24, 2013) ("Voluntary Respondent Mem.").

        As Commerce does when dealing with a nonmarket economy ("NME"),[3]

Commerce informed interested parties of potential surrogate countries from which it

would consider data to value the factors of production ("FOP") used to produce the subject

imports.  See Surrogate Country List at 3, PD 105 at barcode 3143158-01 (July 2, 2013).

Interested parties submitted comments regarding primary surrogate country selection on

August 30, 2013.  See generally Comments on Surrogate Country Selection, PD 133–37

at bar codes 3152484-01–05 (Aug. 30, 2013); ASPA's Surrogate Country Selection

---

[3] A NME country is "any foreign country that . . . does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  Thus, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  19 U.S.C. § 1677b(c)(1).

Comments, PD 138 at bar code 3152512-01 (Aug. 30, 2013); Surrogate Country Comments, PD 140 at bar code 3152598-01 (Aug. 30, 2013).  On October 28, 2013, interested parties also submitted comments on surrogate values for Commerce to use to value mandatory respondents' FOPs.  See generally Surrogate Value Comments, PD 157–161 at bar codes 3160401-01–05 (Oct. 28, 2013); ASPA's Comments re Surrogate Values, PD 155 at bar code 3160197-01 (Oct. 28, 2013).

Commerce published its preliminary results on March 24, 2014.  See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam, 79 Fed. Reg. 15,941, 15,941 (Dep't Commerce Mar. 24, 2014) (preliminary results of antidumping duty administrative review; 2012-2013) ("Prelim. Results").  After considering comments from interested parties on surrogate country and values, Commerce selected Bangladesh as the primary surrogate country for purposes of valuing MPG's and Stapimex's FOPs for the preliminary results.  See Prelim. I&D Memo at 11–15; see also Prelim. Results, 79 Fed. Reg. at 15,941.  Commerce likewise chose to use Bangladeshi data to value the primary FOP, raw shrimp.  See Prelim. I&D Memo at 14–15.

Additionally, Commerce, pursuant to its practice in administrative reviews, applied its recently implemented differential pricing analysis to determine whether "compar[ing] . . . the weighted average of the normal values to the export prices . . . of individual transactions for comparable merchandise" ("A-T"), see 19 C.F.R. § 351.414(b)(3) (2013),[4] was appropriate to calculate dumping margins for both MPG and Stapimex in the

---

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2013 edition, unless otherwise noted.

preliminary results.  <u>See</u> Prelim. I&D Memo at 18–19.  According to the results of its differential pricing analysis, Commerce found that MPG's and Stapimex's U.S. sales showed a pattern of significant export price differences among purchasers, regions, or time periods that could not be accounted for by "a comparison of the weighted average of the normal values with the weighted average of the export prices" ("A-A").  <u>See</u> 19 C.F.R. § 351.414(b)(1); Prelim. I&D Memo at 18–19.  Thus, Commerce preliminarily determined that application of A-T was appropriate to calculate dumping margins for both MPG and Stapimex in the preliminary results.  <u>See</u> Prelim. I&D Memo at 18–19.  Using Bangladesh as the primary surrogate country and applying A-T, Commerce preliminarily determined that the mandatory respondents were selling the subject merchandise at less than fair value during the period of review and calculated weighted-average dumping margins of 9.75% for Stapimex, applying A-T to all of its U.S. sales, and 4.98% for MPG, applying a combination of A-T and A-A, from which Commerce assigned a rate of 6.37% to separate rate respondents.  <u>See</u> <u>Prelim. Results</u>, 79 Fed. Reg. at 15,941–43; <u>see also</u> Prelim. I&D Memo at 9–10.  Commerce assigned a Vietnam-wide rate of 25.76% to respondents who were not entitled to a separate rate.  <u>See</u> <u>Prelim. Results</u>, 79 Fed. Reg. at 15,943; <u>see also</u> Prelim. I&D Memo at 11.

Interested parties submitted case briefs following the preliminary results commenting on Commerce's determinations.  <u>See generally</u> Quoc Viet and Tri Union Case Brief, PD 233 at bar code 3204780-01 (May 28, 2014) ("Quoc Viet Case Br."); Case Brief on Behalf of the Ad Hoc Shrimp Trade Action Committee, PD 234 at bar code 3204785-01 (May 28, 2014); Minh Phu Group's Case Brief, PD 236 at bar code 3204803-

01 (May 28, 2014); Resubmission of Minh Phu Group's Case Brief, PD 250 at bar code 3218837-01 (July 31, 2014).[5]

On September 24, 2014, Commerce published its final results, making no changes to surrogate values or dumping margin calculations from the preliminary results. <u>See Final Results</u>, 79 Fed. Reg. at 57,048. Commerce continued to decline to individually examine Quoc Viet as a voluntary respondent and reiterated its position that reviewing Quoc Viet would be unduly burdensome and inhibit timely completion of the review. <u>See Final I&D Memo</u> at 55–59. Commerce additionally reaffirmed its decision to reject Quoc Viet's self-calculated dumping margin submissions and MPG's case brief for containing untimely filed new factual information. <u>See id.</u> at 59–61. Commerce later amended its final results to correct two ministerial errors pursuant to a request from VASEP.[6] <u>See generally Amended Final Results</u>, 79 Fed. Reg. 65,377. Thereafter, this consolidated action ensued challenging Commerce's determinations in the <u>Final Results</u>.

---

[5] On May 28, 2014, Quoc Viet submitted a case brief joined by Tri Union commenting in part on Commerce's rejection of Quoc Viet's self-calculated antidumping duty margin from prior submissions as untimely filed new factual information. <u>See generally</u> Quoc Viet Case Brief. On the same date, MPG submitted its case brief primarily challenging several aspects of Commerce's differential pricing analysis, which MPG later resubmitted on July 31, 2014 redacting certain portions of the brief after Commerce determined that those portions of the case brief included untimely filed new factual information. <u>See generally</u> Minh Phu Group's Case Brief; Resubmission of Minh Phu Group's Case Brief.

[6] Before Commerce was able to correct the ministerial errors and publish the <u>Amended Final Results</u>, this action had already been filed, vesting the court with jurisdiction and preventing Commerce from correcting the ministerial errors without leave from the court. <u>See Far Eastern New Century Corp. v. United States</u>, 36 CIT __, __, 867 F. Supp. 2d 1309, 1311–12 (2012) (citing <u>Zenith Elecs. Corp. v. United States</u>, 884 F.2d 556, 560–61 (Fed. Cir. 1989)). On October 24, 2014, the court granted Defendant's motion for leave to permit Commerce to correct ministerial errors and issue and publish amended final results. <u>See</u> Order, Oct. 24, 2014, ECF No. 13.

Tri Union and Quoc Viet challenge Commerce's decision to select Bangladesh as the primary surrogate country. See Mem. Supp. Mot. Tri Union Frozen Products, Inc. J. Agency R. 7–12, Mar. 30, 2015, ECF No. 48 ("Tri Union Br."); Mem. Supp. Mot. Quoc Viet Seaproducts Processing Trading and Import-Export Co., Ltd. J. Agency R. 25–31, Mar. 30, 2015, ECF No. 46 ("Quoc Viet Br."). Tri Union and Quoc Viet also challenge that Commerce's decision to use Bangladeshi data to value all raw shrimp irrespective of species because Indonesian data is the best available information on the record to value mandatory respondents' consumption of white vannamei shrimp. See Tri Union Br. 12–15; Quoc Viet Br. 31–34.

Quoc Viet separately claims that Commerce's refusal to individually examine it as a voluntary respondent is not in accordance with law. See Quoc Viet Br. 13–19. Quoc Viet also contends that Commerce unlawfully rejected its submissions following the preliminary results, which included a self-calculated antidumping duty margin for containing untimely filed new factual information. See id. at 19–25. Similarly, VASEP argues that Commerce acted contrary to its own regulations and abused its discretion by rejecting MPG's case brief for containing untimely filed new factual information. See Resp't Pls. VASEP and Individual VASEP Members' Br. Supp. Mot. J. Agency R. 10–16, Mar. 30, 2015, ECF No. 50 ("VASEP Br.").

VASEP challenges Commerce's implementation and application of its differential pricing analysis to evaluate whether application of A-T to calculate the mandatory respondents' dumping margins was warranted in the instant review. See id. at 16–44. Quoc Viet has incorporated VASEP's arguments relating to Commerce's differential

pricing analysis by reference.  See Quoc Viet Br. 4.  Moreover, VASEP claims Commerce acted against its practice by failing to convert Bangladeshi surrogate values that were denominated in U.S. dollars to Bangladeshi taka before accounting for inflation using a Bangladeshi inflator rate.  See VASEP Br. 44–45.

Lastly, Ad Hoc Shrimp asserts in its Rule 56.2 motion that Commerce's use of Bangladeshi data to value labor renders the final results of the review unsupported by substantial evidence.  See Mot. Ad Hoc Shrimp Trade Action Committee for J. Agency R. Under USCIT Rule 56.2 15–30, Mar. 30, 2015, ECF No. 49-3 ("Ad Hoc Shrimp Br.").

Defendant United States ("Defendant") responds that the court should sustain Commerce's determinations in the final results except for Commerce's decision to use Bangladeshi labor data, for which Defendant requests a voluntary remand.  See Def.'s Resp. Opp'n Pls.' Mots. J. Agency R. 15–89, Sept. 10, 2015, ECF No. 72 ("Def.'s Resp.").  Ad Hoc Shrimp similarly responds that the court should sustain Commerce's final results except for Commerce's decision to use Bangladeshi labor data.  See Ad Hoc Shrimp Br. 15–30; Def.-Intervenor Ad Hoc Shrimp Trade Action Committee's Resp. Consolidated Pls.' Mots. J. Agency R. Under USCIT Rule 56.2 6–20, Sept. 24, 2015, ECF No. 76.

The court finds that Commerce's primary surrogate country selection and decision to use Bangladeshi data to value all raw shrimp consumption are supported by substantial evidence and in accordance with law.  The court also finds that Commerce's decision to decline to review Quoc Viet as a voluntary respondent is in accordance with law. Additionally, Commerce's rejection of Quoc Viet's margin calculation submissions and rejection of MPG's case brief for containing untimely filed new factual information are

reasonable.  Further, the court sustains Commerce's application of its differential pricing

analysis and subsequent use of A-T to calculate the mandatory respondents' antidumping

duty rates.  Moreover, the court finds that VASEP has failed to exhaust its administrative

remedies with respect to (1) its challenge to the adequacy of Commerce's explanation for

changing its practice of using the Nails test to its differential pricing analysis and (2) its

challenge to the manner in which Commerce has accounted for inflation for certain

surrogate values.  In these respects, Commerce's final results are sustained.  Finally, the

court grants Defendant's request for a voluntary remand for Commerce to reconsider its

reliance on Bangladeshi labor data to calculate respondents' labor FOP.  The court

reaches its conclusions on the foregoing issues for the reasons discussed below.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C.

§ 1581(c) (2012),[7] which grant the court authority to review actions contesting the final

determination in an administrative review of an antidumping duty order.  The court will

uphold Commerce's determination unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Commerce's Decision to Select Bangladesh as the Primary Surrogate Country is Supported by Substantial Evidence and in Accordance With Law

Tri Union and Quoc Viet both challenge Commerce's selection of Bangladesh as

the primary surrogate country.  See Tri Union Br. 7–12; Quoc Viet Br. 25–31.  Tri Union

---

[7] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

and Quoc Viet argue that because the most important FOP of the subject merchandise is raw shrimp, and Indonesian data provides superior data regarding that FOP relative to Bangladeshi data, Commerce's selection of Bangladesh as the primary surrogate country is unsupported by substantial evidence and not in accordance with law.  See Tri Union Br. 7; Quoc Viet Br. 25–26.  Defendant argues that Commerce reasonably chose Bangladesh as the primary surrogate country because it offers the "best available information" and is both at a level of economic development comparable to Vietnam and a significant producer of comparable merchandise.  See Def.'s Resp. 15–22; see also 19 U.S.C. § 1677b(c)(1), (c)(4).  Commerce's decision to select Bangladesh as the primary surrogate country is supported by substantial evidence and in accordance with law.

In NME antidumping duty proceedings, Commerce generally calculates normal value "on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  19 U.S.C. § 1677b(c)(1).  Commerce is obligated to value the FOPs used to produce the subject merchandise on the basis of "the best available information regarding the values of such factors . . . in one or more market economy countries that are-- (A) at a level of economic development comparable to that of the [NME] country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(1), (c)(4).  While Commerce has broad discretion in deciding what constitutes the best available information, see QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the antidumping duty statute), it must ground its selection of the best available information in the overall purpose of the antidumping duty statute,

calculating accurate dumping margins.  See CS Wind Vietnam Co. v. United States, 38

CIT __, __, 971 F. Supp. 2d 1271, 1277 (2014) (citing Rhone Poulenc, Inc. v. United

States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); see also Parkdale Int'l v. United States,

475 F.3d 1375, 1380 (Fed. Cir. 2007).

        Although Commerce may use multiple surrogate countries to calculate normal

value in NME cases, Commerce's regulatory preference is to "value all factors in a single

surrogate country."  19 C.F.R. § 351.408(c)(2).  To implement this preference, Commerce

selects a primary surrogate country using a process tracking the requirements of 19

U.S.C. § 1677b(c)(1) and (4).  See generally Import Admin., U.S. Dep't Commerce, Non-

Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004),

available at, http://ia.ita.doc.gov/policy/bull04-1.html (last visited Mar. 28, 2016) ("Policy

Bulletin").  Commerce's Policy Bulletin outlines the following process: (1) the Office of

Policy ("OP"), in response to a written request, assembles "a list of potential surrogate

countries that are at a comparable level of economic development to the NME country";

(2) Commerce identifies countries from the list "with producers of comparable

merchandise"; (3) Commerce "determines whether any of the countries which produce

comparable merchandise are 'significant' producers of that comparable merchandise";

and (4) if more than one country satisfies steps (1)–(3), Commerce will select "the country

with the best factors data."  See generally id.

        To identify potential surrogate countries that are at a level of economic

development comparable to the NME country in accordance with 19 U.S.C.

§ 1677b(c)(4)(A), Commerce requests its OP to create a list of potential surrogate

countries whose per capita gross national income ("GNI")[8] fall within a range that the OP

deems comparable to the GNI of the NME.  See id. at 2; see also Surrogate Country List

at 1.    Thereafter, Commerce evaluates which of the potential surrogate countries are

"significant producers of comparable merchandise," as required by 19 U.S.C.

§ 1677b(c)(4)(B).[9]    See Policy Bulletin at 2–3.    If more than one candidate country

remains, Commerce considers each country's data and selects the country that provides

the best data for the FOPs.  See id. at 4.

Commerce is given broad discretion in assessing what data sources it will rely on

in calculating normal value in a NME proceeding given that "best available information" is

not defined by statute.  QVD Food Co., 658 F.3d at 1323.  To determine what constitutes

the best available information, Commerce evaluates the quality and reliability of data

---

[8] Although Commerce's regulations provide that it uses per capita gross domestic product ("GDP") as the measure of economic comparability, see 19 C.F.R. § 351.408(b), it is Commerce's practice to rely on GNI as opposed to GDP because "while the two measures are very similar, per capita GNI is reported across almost all countries by an authoritative source (the World Bank), and because the Department believes that the per capita GNI represents the single best measure of a country's level of total income and thus level of economic development." Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,246 n.2 (Dep't Commerce Mar. 21, 2007) (request for comment).  The court need not analyze the reasonableness of this practice since no party has challenged the use of GNI to determine economic comparability as contrary to Commerce's regulation.    Nonetheless, Commerce's use of GNI to determine economic comparability has been considered reasonable. See, e.g., Clearon Corp. v. United States, 38 CIT __, __, Slip Op. 14-88, at *9–10 (July 24, 2014) (finding Commerce's reliance on GNI reasonable and in accordance with law).

[9] Commerce finds that a country is a significant producer of comparable merchandise if it is a significant net exporter, i.e., a country whose exports of comparable merchandise exceeds its imports of the same.  See Policy Bulletin at 1 n.1; H.R. Rep. No. 100-576, at 590 (1988), as reprinted in 1988 U.S.C.C.A.N. 1547, 1623. Commerce is not guided by defined parameters in determining which countries are significant producers of comparable merchandise because the inquiry is "specific to the merchandise in question" and "the standard . . . will vary from case to case." See Policy Bulletin at 3; see also 19 U.S.C. § 1677b(c)(4)(B).

sources from the remaining countries offered to value respondents' FOPs favoring data

that is: (1) specific to the input in question; (2) representative of a broad market average

of prices; (3) net of taxes and import duties; (4) contemporaneous with the period of

review; and (5) publicly available.  See Policy Bulletin at 4.  Commerce prefers to select

surrogate value data that satisfy the breadth of these criteria.  See Final I&D Memo at

48–49.  Commerce has stated that "data quality is a critical consideration affecting

surrogate country selection" because "a country . . . is not of much use as a primary

surrogate if crucial factor price data from that country are inadequate or unavailable."

Policy Bulletin at 4.  In reviewing Commerce's determination of what constitutes the best

available information with respect to a particular FOP, it is not for the court to reweigh the

evidence, see Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB, 975

F.2d 807, 815 (Fed. Cir. 1992), but rather, to determine if the evidence relied upon by

Commerce was sufficient to support its determination while considering detracting

evidence.  See Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also

Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir.

1994).

Here, because Commerce treats Vietnam as a NME, it initiated its surrogate

country selection process pursuant to 19 U.S.C. § 1677b(c) as outlined in its Policy

Bulletin.  See Prelim. I&D Memo at 5, 11; see also Certain Frozen Fish Fillets From the

Socialist Republic of Vietnam, 68 Fed. Reg. 4,986, 4,990 (Dep't Commerce Jan. 31,

2003) (notice of preliminary determination of sales at less than fair value) (stating that

Commerce designated Vietnam as a NME country on November 8, 2002 for purposes of

antidumping and countervailing duty proceedings as of July 1, 2001).   Commerce requested that its OP issue a list of potential surrogate countries that are economically comparable to Vietnam ("OP List").  See Prelim. I&D Memo at 11–12; see also Surrogate Country List at 1.  The OP List, which was placed on the record on July 2, 2013, provided the following GNI values from 2011 derived from the World Bank's World Indicators database, published in 2013, for Vietnam and six countries that Commerce deemed economically comparable to Vietnam: Vietnam $1,270, Bangladesh $780, Pakistan $1,120, India $1,420, Nicaragua $1,510, Bolivia $2,020, Philippines $2,210.   See Surrogate Country List at 3; see also Prelim. I&D Memo at 12.  Commerce stated that it will rely on data from a country on the OP List unless it determines that "all of these countries are not significant producers of comparable merchandise, do not provide a reliable source of publicly available surrogate data or are unsuitable for use for other reasons, or we find another equally comparable country as an appropriate surrogate." Prelim. I&D Memo at 12.  After reviewing shrimp production information from the Food and Agriculture Organization of the United Nations Fisheries Statistics, Commerce concluded that Bangladesh, India, Nicaragua, Pakistan, and the Philippines are all significant producers of shrimp and that only Bolivia is not a significant producer of shrimp. See id. at 13; see also ASPA's Surrogate Country Selection Comments at Attach. 1. Although Commerce found that five of the six countries on the OP List were economically comparable to Vietnam and significant producers of comparable merchandise, it only evaluated data from Bangladesh and India in the preliminary results because no party

had submitted surrogate value data from the other surrogate country candidates on the OP List.  See Prelim. I&D Memo at 13–15.

To determine whether Bangladesh or India offered the best available FOP data, Commerce largely focused its inquiry on which country offered the best data for raw shrimp because "the value of the main input, head-on, shell-on shrimp, is a critical FOP in the dumping calculation as it accounts for a significant percentage of [normal value]." Id. at 14.  The competing sources of data were (1) a study conducted by the Network of Aquaculture Centres in Asia-Pacific ("NACA") offering Bangladeshi price data for raw shrimp, compiled by the United Nation's Food and Agricultural Organization,[10] and (2) an article from AQUA Culture Asia Pacific Magazine ("AQUA") offering raw shrimp price data from India.  See id.  Commerce noted that it placed significant importance on a data source's ability to value raw shrimp by count size because "the subject merchandise and the raw shrimp input are both sold on a count-size specific basis."  See id.  Commerce found that the Indian AQUA data did not meet Commerce's data selection criteria because the data did not cover particular count-size ranges and did not provide how its pricing information was derived.  See id.  By contrast, Commerce found that the Bangladeshi NACA data did not have these concerns.  See id. at 14–15.  Commerce therefore selected Bangladesh as the primary surrogate country for valuing MPG's and Stapimex's FOPs in the preliminary results because Bangladesh satisfied the surrogate

---

[10] The NACA case study was based upon data collected from three countries—Vietnam, Bangladesh, and Indonesia.  See Surrogate Value Comments at Ex. SV-2 at ii.  However, the data source was originally submitted to the record by Vietnamese respondents and was offered as support for Commerce to select Bangladesh as the primary surrogate country in the review. See Surrogate Value Comments at 6–13.

country criteria and provided the best available information for the most significant FOP,

raw shrimp.  See id. at 15.

Commerce reaffirmed its selection of Bangladesh as the primary surrogate country

in the final results and continued to use the Bangladeshi NACA data to value raw shrimp.

See Final I&D Memo at 9–17; see also Final Results, 79 Fed. Reg. at 57,047–48.  In

reaching its final determination, Commerce defended its selection against arguments that

Commerce was required to select Indonesia rather than Bangladesh as the primary

surrogate country.[11]  Commerce first explained that "there is no substantiated evidence

on this record that Indonesia is at a level of economic development comparable to that of

Vietnam."  Final I&D Memo at 10.  Notwithstanding the inability to measure Indonesia's

level of economic development, Commerce additionally determined that Bangladeshi

data for raw shrimp is superior to Indonesian data because "the fact that the Indonesian

NACA data contain prices for both species is counterbalanced by the fact that they lack

prices with respect to certain count sizes as compared to the Bangladeshi NACA data."

Id. at 14.  Commerce, moreover, pointed to deficiencies in Indonesian data with regard to

financial ratios and labor, whereas Bangladeshi data offered data for all FOPs except for

shrimp scrap, which it found to be an insignificant component of the normal value.  See

---

[11] Following the preliminary results, Quoc Viet filed its case brief, joined by Tri Union, arguing that Commerce should have instead selected Indonesia as the primary surrogate country, a country not on the OP List.  See Quoc Viet Case Br. at 1–7; see also Final I&D Memo at 5–6, 8.  The case brief did not dispute Commerce's determinations that Bangladesh is economically comparable to Vietnam and is a significant producer of shrimp.  Instead, Quoc Viet and Tri Union contended that Commerce should have instead selected Indonesia as the primary surrogate country because Indonesian NACA data offered values for the two species of shrimp produced and sold by MPG and Stapimex and therefore is the best available information to value raw shrimp.  See Quoc Viet Case Br. at 1–7.

id. at 16.  Thus, "based on the overall consideration of the statutory criteria and the quality of data," Commerce continued to find Bangladesh to be the most appropriate choice.  Id. at 17.

Commerce's surrogate country selection is supported by substantial evidence and in accordance with law.  In following its standard practice, Commerce identified economically comparable countries that are significant producers of comparable merchandise.  Among the economically comparable countries that are significant producers, Commerce selected Bangladesh as the primary surrogate country over the other candidate countries based on its assessment of the data available on the record.  Given that Commerce's surrogate country selection was significantly informed by data for raw shrimp, the reasonableness of Commerce's surrogate country selection is heavily dependent upon the reasonableness of Commerce's assessment of the Bangladeshi NACA data and the Indonesian NACA data.

The NACA study, which is the source of both the Bangladeshi and Indonesian data at issue here, was conducted in three countries—Vietnam, Bangladesh, and Indonesia––"with the aim of assessing the impact of the 2004 Indian Ocean tsunami and of the introduction of anti-dumping duties on the shrimp farming sectors of countries in the Asian region."  Surrogate Value Comments at Ex. SV-2 at ii.  The mandatory respondents reported sales of up to fifteen count sizes of shrimp.  See Final I&D Memo at 14; see also Analysis for the Final Results for Minh Phu Group at 3, CD 186 at bar code 3229573-01 (Sept. 19, 2014) ("MPG Final Analysis"); Analysis for the Final Results of Soc Trang Seafood Joint Stock Company at 3, CD 194 at bar code 3229584-01 (Sept. 19, 2014)

("Stapimex Final Analysis").  Count size refers to the size of shrimp, which in this case

has been measured by the number of pieces per kilogram ("Pcs/Kg").  The NACA study

includes data for the following groupings of count sizes, beginning with the largest and

most expensive shrimp: (1) Under 20 Pcs/Kg, i.e., U20; (2) 21–30 Pcs/Kg; (3) 31–44

Pcs/Kg; (4) 45–66 Pcs/Kg; (5) 67–100 Pcs/Kg; (6) Over 100 Pcs/Kg.  See MPG Final

Analysis at 3; Stapimex Final Analysis at 3.  These groupings of count sizes encompass

all of the count sizes of shrimp reported by the mandatory respondents.  See MPG Final

Analysis at 3; Stapimex Final Analysis at 3.  The mandatory respondents also reported

sales of two species of shrimp—penaeus monodon, i.e., black tiger shrimp, and penaeus

vannamei, i.e., white vannamei shrimp.  See Final I&D Memo at 14; see also Surrogate

Value Comments at Ex. SV-2 at 3.  The NACA study provides data for these two species

of shrimp to the extent that they were commonly traded in the country during the time the

study was conducted.

Both the Bangladeshi NACA data and the Indonesian NACA data have

deficiencies in fully accounting for mandatory respondents' reported count sizes and

species.  The Indonesian NACA data "has data for four count sizes of black tiger and

three count sizes of vannamei."  Final I&D Memo at 14.  Specifically, the Indonesian data

contain data for count sizes (2)–(5) of black tiger and (3)–(5) of white vannamei.  See

MPG Final Analysis at 3; Stapimex Final Analysis at 3; see also Final I&D Memo at 15

n.47.  "In contrast, Bangladesh data has five count sizes for black tiger but no count size

data for vannamei."  Final I&D Memo at 14.  Specifically, the Bangladeshi data contain

data for count sizes (1)–(5) of black tiger shrimp.  See MPG Final Analysis at 3; Stapimex

Final Analysis at 3; see also Final I&D Memo at 15 n.47.  "[T]he Indonesian black tiger prices cover about 85 percent of respondents' reported count sizes, while the vannamei prices cover only between 49 percent and 57 percent of respondents' reported count sizes," and the Bangladeshi NACA data "cover over 94 percent of count sizes of black tiger shrimp reported by both respondents."   Final I&D Memo at 15.   Neither the Bangladeshi data nor the Indonesian data contain data for count size (6) regardless of species, therefore, both data sources are equivalent in that regard.  See id.  Simply put, while the Indonesian NACA data is more specific to species by providing independent pricing information for black tiger shrimp and white vannamei shrimp, the Bangladeshi NACA data is more specific to count size pricing information.

After considering both data sources, Commerce could not "conclude from the record that accounting for prices on a species-specific basis is more accurate than accounting for prices for almost all the count sizes."  Id. at 38.  Because the NACA study indicated that "shrimp price depends on the size and seasonal crop . . . especially for bigger size [shrimp]," Surrogate Value Comments at Ex. SV-2 at 3, Commerce considered data that offered prices for a broad range of count sizes, even for one species, to be more accurate and superior to species-specific data that offered prices for a limited range of count sizes.  See Final I&D Memo at 14–15, 38.  Commerce favored the Bangladeshi NACA data and ultimately selected Bangladesh as the primary surrogate country because it found that the Indonesian NACA data, though having data for both species, suffered from a limited availability of prices for a broad range of count sizes.  Thus, Commerce chose to rely upon the Bangladeshi NACA data because "what the data for Bangladesh

lacks in vannamei prices is outweighed by other factors, such as Bangladesh's economic comparability to Vietnam . . . and a larger range of pricing for count sizes of black tiger shrimp, particularly the largest, most expensive shrimp count size." Id. at 38.  Based on the record before Commerce and its assessment of the available data, Commerce's decision to select Bangladesh as the primary surrogate country is reasonable.

Tri Union and Quoc Viet disagree with Commerce's assessment of the competing data sources.  Tri Union and Quoc Viet do not dispute Commerce's determination that the Bangladeshi NACA data satisfies Commerce's criteria for data quality.  In fact, they accept that "the Indonesia NACA data and the Bangladeshi NACA data are equally contemporaneous, publicly available, tax and duty exclusive, and representative of broad market averages," given that both sources are derived from the same NACA study.  Tri Union Br. 9–10; Quoc Viet Br. 28.  Instead, they argue that Commerce improperly prioritized count size over species of shrimp in considering data for purposes of surrogate country selection.  Tri Union and Quoc Viet contest Commerce's determination that Bangladeshi data is the best available information because "the NACA data for Bangladesh reflect prices only for a single species of shrimp: *monodon*, or black tiger shrimp" and yet "the respondents in this segment of the proceeding produced and sold both white vannamei and black tiger shrimp species."[12]  Tri Union Br. 9; Quoc Viet Br. 28.

---

[12] Commerce found that the mandatory respondents each "sold roughly equal quantities of black tiger and vannamei shrimp during the period of review."  Final I&D Memo at 14.  For MPG, Commerce found that the quantity of its sales during the period of review comprised of [[           ]].  See MPG Final Analysis at 3.  For Stapimex, Commerce found that the quantity of its sales during the period of review comprised of [[           ]].  See Stapimex Final Analysis at 3.

"The same NACA study, however, includes Indonesian prices for both black tiger and white vannamei shrimp raw material."  Tri Union Br. 9; Quoc Viet Br. 28; see also Surrogate Value Comments at Ex. SV-2 at 133–34.  Tri Union and Quoc Viet claim that Commerce's decision to use the Bangladeshi NACA data is unsupported by substantial evidence because Commerce "failed to address the record evidence that demonstrated the significant difference in prices based on shrimp species."  Tri Union Br. 12; Quoc Viet Br. 29–30.

Commerce selected Bangladesh as the primary surrogate country primarily because it offered data for raw shrimp on a wider range of count-specific prices.  See Final I&D Memo at 13–16.  Commerce, in dismissing Indonesia as the primary surrogate country, made much of the fact that Indonesian data "do not contain as many count-specific prices in the black tiger shrimp category as that of the Bangladeshi data, which have a fuller array of prices for black tiger shrimp that would cover more of the respondents' reported count sizes."  See id. at 16.  Commerce prioritized a country's data source's ability to value a broader range of count sizes of mandatory respondents' reported raw shrimp consumption rather than its ability to value species specific raw shrimp.  See Prelim. I&D Memo at 14; Final I&D Memo at 13.  The significance Commerce ascribed to count size is supported by record evidence that showed "'shrimp price depends on the size and seasonal crop . . . especially for bigger size for both [black tiger shrimp] and [white vannamei shrimp].'"  Final I&D Memo at 15 (quoting Surrogate Value Comments at Ex. SV-2 at 3).  Further, "the subject merchandise and the raw shrimp input are both sold on a count-size specific basis."  Id. at 13.  The greater significance given to

count size as opposed to species is reinforced by the fact that out of a total of fourteen total physical characteristics of the subject merchandise, count size is listed as the third most important while species is listed as the thirteenth.  See id. at 15 n.44; see also Def.'s Resp. 24.  Thus, the record supports Commerce's decision to prefer a data source that provides values for a broader range of count sizes rather than values for specific species.  Tri Union Br. 11–12; Quoc Viet Br. 30.

Tri Union and Quoc Viet further argue that "in favor of one additional count-size range in one species, Commerce ignored completely the relevance of species-specificity." Tri Union Br. 11; Quoc Viet Br. 29–30.  Tri Union and Quoc Viet claim that "none of the points made by Commerce explain why the use of the Bangladeshi data, which might require less extrapolation for unavailable count sizes, but are of a different species, results in more accurate calculations than the Indonesian data, which might require more extrapolation for unavailable count sizes, but are of an identical species."  Tri Union Br. 11–12; Quoc Viet Br. 30.

However, a significant portion of the mandatory respondents' sales are attributable to that one missing count size in the Indonesian data.  Commerce found

> a large portion of both respondents' sales are for the larger count sizes which the Indonesian data lacks for both species; . . . the Bangladeshi NACA data covers the vast majority of both respondents' count sizes; . . . both respondents sold roughly equal quantities of black tiger shrimp and vannamei shrimp during the POR; . . . and . . . a large percentage of both respondents' count sizes would not be covered by Indonesian NACA data.

Final I&D Memo at 14 (citing MPG Final Analysis at 3; Stapimex Final Analysis at 3).

Commerce specifically explained that "Indonesian data does not contain prices not only

for the largest count-size of shrimp for both species [, i.e., U20], but also for the second largest size of the vannamei species [, i.e., 21–30 Pcs/Kg]." Id. at 38.  As a result of these deficiencies, the Indonesian data fails to account for a significant portion of the mandatory respondents' sales observations and quantity because the larger count sizes, as evidenced by the record, were the most expensive and contributed significantly to their sales.[13]  See id. at 15; see also MPG Final Analysis at 2–3; Stapimex Final Analysis at 2–3.  While Tri Union and Quoc Viet present evidence showing price differences among species, they are unable to controvert record evidence indicating that count size, not species, is the driving force for the price of raw shrimp.

Tri Union and Quoc Viet additionally argue that Commerce was "[d]istracted by the non-issue of Indonesia's economic comparability" in selecting the most appropriate primary surrogate country.  See Tri Union Br. 9; Quoc Viet Br. 27.  Commerce defended its selection in part due to the absence of Indonesia's GNI on the record.  The data on the record appeared to substantiate the claim that Indonesia is a significant producer of comparable merchandise and contain surrogate values for subject merchandise.  See Final I&D Memo at 12–14; see also Surrogate Value Comments at Ex. SV-2.  However, any information regarding Indonesia's level of economic development was absent from the record.  See Final I&D Memo at 10.  Commerce concluded that "Bangladesh fulfills the surrogate country selection criteria" and "the record of this case does not contain

---

[13] For MPG, the Indonesian NACA data fails to account for [[        ]] of its total sales quantity and [[        ]] of its total sales observations when categorizing its sales by count size.  See MPG Final Analysis at 2–3.  For Stapimex, the Indonesian NACA data fails to account for [[        ]] of its total sales quantity and [[        ]] of its total sales observations when categorizing its sales by count size.  See Stapimex Final Analysis at 2–3.

substantiated evidence regarding Indonesia's GNI that would enable [Commerce] to make a finding that Indonesia was at a level of economic development comparable to Vietnam during this [period of review]." Id. at 12. Commerce informed parties that it would "consider other countries on the case record if the record provides . . . adequate information to evaluate them." Surrogate Country List at 3. However, there was inadequate information on the record to evaluate whether Indonesia is economically comparable to Vietnam. The only reference to Indonesia's level of economic development on the record is found in MPG's rebuttal brief, but that reference was "unsubstantiated by any record evidence that [Commerce] could rely upon in evaluating whether Indonesia is at a level of economic development comparable to Vietnam." Final I&D Memo at 10; see also Minh Phu Group Rebuttal Case Brief at 3, PD 239 at bar code 3206463-01 (June 2, 2014). If an interested party believed that a country not on the OP List, in this case Indonesia, is a country that is economically comparable to Vietnam, it was incumbent on that party to submit that evidence to Commerce so that it could be placed on the record. See QVD Food Co., 658 F.3d at 1324 (providing that "the burden of creating an adequate record lies with [interested parties] and not with Commerce"). Commerce thus selected Bangladesh in part because it was unable to determine whether Indonesia is economically comparable to Vietnam. Tri Union and Quoc Viet contend that the absence of Indonesia's GNI does not forestall Commerce from selecting Indonesia because "Commerce already has acknowledged that Indonesia is economically

comparable to Vietnam."[14]   Reply by Quoc Viet Seaproducts Processing Trading and

Import-Export Co., Ltd.; Tri Union Frozen Products Inc.; Mazzetta Company LLC; and

---

[14] To demonstrate that Commerce has already acknowledged that Indonesia is economically comparable to Vietnam, Tri Union and Quoc Viet make much of the fact that Commerce selected Indonesia as the primary surrogate country in the preceding administrative review of certain frozen warmwater shrimp from Vietnam and in Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 79 Fed. Reg. 19,053 (Dep't Commerce Apr. 7 2014) (final results of antidumping duty administrative review and new shipper review; 2011–2012). See Tri Union Br. 8; Quoc Viet Br. 26–27. Tri Union and Quoc Viet, however, ignore the fundamental administrative law principle that the agency must make its determinations based upon the record before it. Each of Commerce's proceedings are treated "as independent proceedings with separate records and which lead to independent determinations." E.I. DuPont de Nemours & Co. v. United States, 22 CIT 19, 32 (1998). Likewise, judicial review of such determinations must be limited to the record before the agency that was compiled during that segment of the proceeding, excluding previous and subsequent proceedings. Cf. QVD Food Co., 658 F. 3d at 1324–25 (providing that "[j]udicial review of antidumping duty administrative proceedings is normally limited to the record before the agency in the particular review proceeding at issue and does not extend to subsequent proceedings"). At oral argument, Tri Union and Quoc Viet argued that Commerce can carry over its determination from other proceedings that Indonesia is economically comparable to Vietnam in this review. See Oral Arg. 04:26–06:01, Feb. 10, 2016, ECF No. 101. However, it is Commerce's practice to make a case-by-case determination regarding which countries are economically comparable to the NME country based upon the record of that proceeding. See generally Policy Bulletin. Therefore, the fact that Commerce selected Indonesia as the primary surrogate country in those proceedings does not detract from Commerce's surrogate country selection here.

Tri Union and Quoc Viet additionally claim that Commerce has confirmed that Indonesia is economically comparable to Vietnam in the instant review because Commerce relied on Indonesian data to value a FOP byproduct, shrimp scrap. Commerce claimed that there was a "need to rely on the scrap value from another country," Final I&D Memo at 16, but an interested party timely submitted shrimp scrap data from India and Commerce did not explain why that data was unusable. See ASPA's Comments re Surrogate Values at Attach. 7 at Ex. 1. Commerce's reliance on Indonesian data to value shrimp scrap may present an arguable issue for that FOP given Commerce's inability to evaluate Indonesia's economic comparability, but Quoc Viet and Tri Union do not challenge Commerce's choice in data to value shrimp scrap. Quoc Viet and Tri Union argue instead that Commerce's decision to use Indonesian data to value shrimp scrap undermines its surrogate country selection. However, Commerce did not rely on shrimp scrap data to inform its primary surrogate country selection because Commerce found shrimp scrap to be a relatively minor FOP. See Final I&D Memo at 16; Def.'s Resp. 20; see also MPG Final Analysis at Ex. 5. Commerce principally grounded its surrogate country selection in its determination that the Bangladeshi NACA data for raw shrimp is superior to the Indonesian NACA data. Thus, Commerce's use of Indonesian data to value shrimp scrap does not undermine its decision to select Bangladesh rather than Indonesia as the primary surrogate country.

Ore-Cal Corporation to Def.'s and Def.-Intervenor's Mem. Resp. Pls.' Rule 56.2 Mot. J. Agency R. 9, Dec. 3, 2015, ECF No. 87 ("Quoc Viet & Tri Union Reply").   Despite Tri Union's and Quoc Viet's protests concerning Commerce's implicit acknowledgment of Indonesia's economic comparability, Commerce's reliance on Indonesian data to value shrimp scrap does not serve to establish that Indonesia is at a level of economic development comparable to Vietnam.   Commerce reasonably weighed the record data along with the other surrogate country criteria to support its selection of Bangladesh as the primary surrogate country.   Commerce found that Bangladeshi data was superior to Indonesian data and despite both countries being significant producers of merchandise, Commerce could only weigh evidence regarding the relative economic comparability of Bangladesh and India.   Therefore, the court cannot say that Commerce's choice of Bangladesh as the primary surrogate country was unreasonable.

Because Commerce reasonably determined that Bangladesh offered the best available information, Commerce's decision to select Bangladesh as the primary surrogate country is supported by substantial evidence and in accordance with law.

## II.   Commerce's Decision to Use Bangladeshi Data to Value All Raw Shrimp is Supported by Substantial Evidence and in Accordance With Law

Tri Union and Quoc Viet also challenge Commerce's decision to use Bangladeshi data to value raw shrimp to the extent that Commerce relied upon that data to value mandatory respondents' consumption of white vannamei shrimp.  See Tri Union Br. 12–15; Quoc Viet Br. 31–34.  Tri Union and Quoc Viet argue that Indonesian NACA data is the best available information to value white vannamei shrimp, especially for the count

sizes the data offered, and Commerce should use that data to supplement the Bangladeshi NACA data for white vannamei shrimp consumption because "black tiger shrimp is valued [[                          ]] than white vannamei shrimp of <u>identical</u> sizes."  Tri Union Br. 14–15; Quoc Viet Br. 33.  Tri Union and Quoc Viet assert that "[b]ecause there are no available Bangladeshi white vannamei surrogate values on the record, substantial evidence required that even if Commerce relied on Bangladesh as the primary surrogate country, then Commerce nonetheless should have used the Indonesian white vannamei surrogate values to value the respondents' vannamei factors of production."  Tri Union Br. 14; Quoc Viet Br. 33–34.  Thus, they argue Commerce was required to cure whatever deficiencies the Bangladeshi data has regarding white vannamei shrimp with the Indonesian species-specific data and that Commerce on remand should either "use the available Indonesian white vannamei shrimp pricing data to value the respondents' consumption of white vannamei shrimp or demonstrate why using the Bangladeshi data results in more accurate calculations."  Tri Union Br. 15; Quoc Viet Br. 34.  Defendant maintains that Commerce's reliance on Bangladeshi NACA data for valuing all raw shrimp is supported by substantial evidence because "count-size, not species specification, is a crucial factor in determining surrogate values" and Tri Union and Quoc Viet fail to demonstrate that using a species-specific data source leads to more accurate calculations.  <u>See</u> Def.'s Resp. 26–27.  Commerce's decision to use the Bangladeshi NACA data to value all raw shrimp, including white vannamei shrimp, is supported by substantial evidence and in accordance with law.

As previously stated, Commerce shall, to the extent possible, value FOPs based on the best available information from market economy countries that are economically comparable to the NME country and significant producers of comparable merchandise. See 19 U.S.C. § 1677b(c)(1), (c)(4).   In selecting the best available information, Commerce evaluates the quality and reliability of data sources from the remaining countries offered to value respondents' FOPs favoring data that is: (1) specific to the input in question; (2) representative of a broad market average of prices; (3) net of taxes and import duties; (4) contemporaneous with the period of review; and (5) publicly available. See Policy Bulletin at 4.

While Commerce determined that the Bangladeshi NACA data is the best available information, the Indonesian NACA data made available independent pricing information for three count sizes of white vannamei shrimp that the Bangladeshi NACA data lacked. Notwithstanding the availability of white vannamei shrimp data, Commerce chose not to supplement the Bangladeshi NACA data with the Indonesian white vannamei shrimp data.   In making its decision, Commerce (1) relied upon the absence of any record evidence regarding Indonesia's level of economic development, (2) incorporated its reasons for determining that the Bangladeshi NACA data is superior to the Indonesian NACA data to value raw shrimp, (3) cited its practice and regulatory preference for valuing all FOPs in a single surrogate country, see 19 C.F.R. § 351.408(c)(2), and (4) explained that supplementing the Bangladeshi NACA data with the Indonesian NACA data for white vannamei shrimp would not lead to more accurate calculations and would, in fact,

increase the potential for distortive and inaccurate calculations.  See Final I&D Memo at 37–38.

Commerce's decision here is reasonable.  Commerce relied upon its determination that the Bangladeshi NACA data is the best available information to value mandatory respondents' consumption of raw shrimp.  The Indonesian NACA data "has data for four count sizes of black tiger and three count sizes of vannamei."  Id. at 14.  "In contrast, Bangladesh data has five count sizes for black tiger but no count size data for vannamei." Id.  Because record evidence informed Commerce that count size, not species, outweighs other considerations for valuing raw shrimp, Commerce chose to use the Bangladeshi NACA data because the Bangladeshi NACA data offers a broad range of count-size specific pricing information while the Indonesian NACA data is lacking in that regard.  In making its determination, Commerce explained that it did not make its "determination on a single sub-factor relevant to the data at issue, but rather examined each set of data." Id. at 14.  Thus, Commerce determined that the Indonesian NACA data may be more specific with respect to species, but the Bangladeshi NACA data is more specific with respect to the FOP as a whole.  Once Commerce determined that the Bangladeshi NACA data is the best available information, it was reasonable for Commerce to choose to rely on the single data source that is more specific for the FOP in its entirety rather than integrate another data source from another country that is relatively more specific with regard to a component of the FOP.

In the absence of any authority requiring it to use data from multiple countries to value shrimp, Commerce reasonably chose to value shrimp with data from a single

country.[15]  Commerce explained that "interested parties have not demonstrated that using

data with prices for only a limited range of count sizes, albeit for two species, would result

in a more accurate margin calculation than using the prices available for almost all count

sizes albeit for only one of the species produced and sold by the mandatory respondents."

Id. at 38.  Commerce expressed concerns regarding the several calculations necessary

to ascribe Indonesia's pricing structure to Bangladesh to account for species.  Commerce

explained that "[u]sing this data would . . . require even more adjustment than required

for the Bangladeshi data to match to the mandatory respondents' numerous count size

ranges of shrimp input," Id. at 15, and that "after remedying the relative lack of count size

value data in the data for Indonesia, any improvement in inaccuracy would likely be

outweighed, or at least counterbalanced by, the accuracy loss inherent in this multistep

estimation."  Id. at 38.  Commerce was already forced to undergo additional calculations

to derive the surrogate values for count size (6), regardless of which data source it chose

to use.  To use the Indonesian NACA data to value mandatory respondents' sales of white

vannamei shrimp would also require additional calculations on the other end of the

---

[15] Commerce also cited to its practice that it "normally will value all factors in a single surrogate country."  Final I&D Memo at 37; 19 C.F.R. § 351.408(c)(2).  Here, however, Commerce's primary surrogate country selection cannot lend support to Commerce's choice of data for raw shrimp, nor Commerce's refusal to supplement Bangladeshi data with Indonesian data, because the data for raw shrimp was a primary consideration in the surrogate country selection process.  See Final I&D Memo at 13–16.  While the court ultimately affirms Commerce's decision to use Bangladeshi NACA data to value all raw shrimp, the court notes that it does not reach its decision based on Commerce's reliance on this regulatory preference.  Commerce need not rely on its preference to value all FOPs in the primary surrogate country here because its determination that the Bangladeshi NACA data is the best available information to value raw shrimp is supported by substantial evidence and in accordance with law.  Further, its explanation for its refusal to supplement the Bangladeshi data is reasonable.

spectrum to extrapolate the prices for the largest and second largest count size for white vannamei shrimp.  See id.  Commerce decided that it would be more accurate to only rely upon the Bangladeshi NACA data to value raw shrimp because "extensive extrapolation from smaller to larger count-sizes would have required assumptions and undermined any potential benefits of species-specific data."  Def.'s Resp. 26; see also Final I&D Memo at 38.  Thus, Commerce found that using the Indonesian NACA data to supplement the Bangladeshi NACA data would not lead to more accurate margin calculations because the Indonesian NACA data is lacking, even for white vannamei shrimp information.

Commerce's reasons for refusing to incorporate the Indonesian NACA data in its calculations suffice to demonstrate that its decision is supported by substantial evidence and in accordance with law.  While the Indonesian NACA data provides for species-specific data where Bangladeshi NACA data does not, that fact alone does not render Commerce's exclusive use of the Bangladeshi NACA data unsupported by substantial evidence.  There is no authority that requires Commerce to further manipulate the data it determines is the best available information.  Commerce's determination is further supported by the concern that using two data sources from two countries would potentially lead to distortive and inaccurate calculations.  Taken together, Commerce's decision to use the Bangladeshi NACA data to value all raw shrimp, including white vannamei shrimp, is reasonable.

In response to Commerce's preference to value all FOPs in a single surrogate country, Tri Union and Quoc Viet argue that "where information from the primary surrogate country is either unavailable or unreliable, Commerce will rely on information

from a secondary surrogate country."  Tri Union Br. 14; Quoc Viet Br. 32.  Without citing

to any authority, they assert that "[b]ecause there are no available Bangladeshi white

vannamei surrogate values on the record, substantial evidence required that . . .

Commerce . . . use[] the Indonesian white vannamei surrogate values to value the

respondents' vannamei factors of production."  Tri Union Br. 14; Quoc Viet Br. 33.  The

only support for their argument is a reference to when Commerce had chosen Indonesia

as the primary surrogate country in a previous review, but chose to rely on data from

another country to value a particular FOP.  Tri Union Br. 14 n. 27; Quoc Viet Br. 32–33 n.

71.  When a primary surrogate country does not have usable data for a particular FOP,

Commerce does look to other countries to find the best available information to value that

FOP.  However, when Commerce has determined information from the primary surrogate

country to be the best available information for a FOP, it does not follow that, absent

extraordinary circumstances, Commerce is additionally required to use information from

a second country to manipulate and cure any and every deficiency in the primary

surrogate country data.

Lastly, Tri Union and Quoc Viet argue that "Commerce is simply wrong to have

claimed . . . that interested parties had not demonstrated that the use of Indonesian white

shrimp surrogate values would result in more accurate antidumping margin calculations."

Tri Union Br. 14; Quoc Viet Br. 33.  They argue "Commerce failed to address the record

evidence demonstrating that there were significant difference in prices based on shrimp

species."  Tri Union Br. 15; Quoc Viet Br. 33.  However, Commerce specifically addressed

the argument that accounting for the price disparity among species using the Indonesian

NACA data would lead to more accurate results.  While Tri Union and Quoc Viet contend that the price of shrimp differs depending on the species, "[t]here is no indication on the record that shrimp prices in Bangladesh are species-driven."  Final I&D Memo at 38.  In fact, Commerce found that "record evidence shows that 'shrimp price depends on the size and seasonal crop . . . especially for bigger size {shrimp}.'"  Id. (quoting Surrogate Value Comments at Ex. SV-2).  Commerce found "no record evidence to suggest that the shrimp price structure between Indonesian black tiger prices and vannamei prices would be the same or similar to that in Bangladesh."  Id.  Commerce concluded that "ascrib[ing] Indonesia's pricing structure to Bangladesh would . . . require several successive calculations . . . [and] any improvement in accuracy would likely be outweighed, or at least counterbalanced by, the accuracy loss inherent in this multistep estimation."  Id. Commerce was not concerned with the complexity of such calculations, but rather, it was concerned with the extensive extrapolation necessary to derive pricing information for the two largest count sizes of white vannamei shrimp.[16]  See id.

Therefore, Tri Union and Quoc Viet are unable to demonstrate that Commerce's refusal to supplement the Bangladeshi NACA data with the Indonesian NACA white vannamei shrimp data is unreasonable.

---

[16] Tri Union and Quoc Viet additionally reiterate their objection that Commerce cannot rely on the absence of GNI data because Commerce has already implicitly confirmed that Indonesia is economically comparable to Vietnam through its use of Indonesian data to value shrimp scrap. See Tri Union Br. 13–14; Quoc Viet Br. 32.  Commerce's determination here, however, is supported on grounds other than the absence of Indonesia's GNI data on the record.

### III.     Commerce's Decision Not to Select Quoc Viet as a Voluntary Respondent  is Reasonable

Quoc Viet argues Commerce's refusal to individually examine it and calculate its own antidumping duty rate as a voluntary respondent is contrary to law.  See Quoc Viet Br. 13–19.  Quoc Viet contends that "Commerce failed to apply the appropriate legal standard under 19 U.S.C. § 1677m in determining whether individual examination of Quoc Viet as a voluntary respondent would have been unduly burdensome and would have inhibited the timely completion of the review."  Id. at 14.  Defendant dismisses Quoc Viet's argument as erroneous, insisting that Commerce correctly determined not to grant Quoc Viet's voluntary respondent requests.  See Def.'s Resp. 28–38.  Defendant maintains that "examination of an additional company, beyond the mandatory respondents already selected, would have been unduly burdensome and inhibited the timely completion of the review."  Id. at 28.  The court finds that Commerce's decision not to individually examine Quoc Viet is reasonable.

In an administrative review of an antidumping duty order, Commerce must calculate individual antidumping duty rates for each known exporter or producer of subject merchandise covered by the review, i.e., respondents.  See 19 U.S.C. §§ 1675(a)(1)(B), 1677f-1(c)(1).  The statute therefore requires that Commerce collect data with respect to sales of subject merchandise from each respondent and calculate individual rates.  However, the statute provides for an exception to Commerce's requirement to individually examine and assign antidumping duty rates for all respondents:

(2) Exception

If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to--

    (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to [Commerce] at the time of selection, or

    (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

19 U.S.C. § 1677f-1(c)(2).  Thus, if there is a large number of exporters or producers covered in an administrative review, Commerce may limit the review to individually examine and "determine the weighted average dumping margins for a reasonable number of exporters or producers."  Id.

When Commerce invokes this exception, as it has done so here, it typically limits the review to individually examine "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country" according to U.S. Customs and Border Protection import data.  See Proposed Methodology for Respondent Selection in Antidumping Proceedings, 75 Fed. Reg. 78,678, 78,678 (Dep't Commerce Dec. 16, 2010) (request for comment) (stating that Commerce has used this option in "virtually every one of its proceedings"); see also 19 U.S.C. § 1677f-1(c)(2)(B).  Those exporters and producers that account for the largest import volume of subject merchandise are then selected as mandatory respondents.  Commerce collects sales data from these mandatory respondents by issuing questionnaires and individually

examines each of the mandatory respondents to calculate their respective antidumping duty rates.

If not initially selected as a mandatory respondent, a respondent may request to be individually examined as a voluntary respondent pursuant to 19 U.S.C. § 1677m(a).[17] A voluntary respondent is individually examined like a mandatory respondent and is given an antidumping duty rate based on its own sales of subject merchandise rather than assigned an antidumping duty rate based on the weighted average rates calculated for the mandatory respondents.   However, Commerce may nevertheless refuse to individually examine the respondent as a voluntary respondent even if the respondent otherwise satisfies the statutory requirements for voluntary respondent treatment.   The relevant language of the governing statute provides:

---

[17] In limited reviews, respondents other than mandatory respondents generally are not individually examined but remain subject to the review.  By application, Commerce assigns these respondents a separate rate by calculating "the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated."   19 U.S.C. § 1673d(c)(5)(A).  However, in NME antidumping duty proceedings, Commerce, through practice, has implemented a rebuttable presumption that all respondents within the NME country are subject to government control.  See Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,247–48 (Dep't Commerce Mar. 21, 2007) (request for comment) ("Methodologies in NME Proceedings"); Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1372 (Fed. Cir. 2003).  In this context, a respondent is entitled to a separate rate if it can establish the absence of both de jure and de facto government control.  See Methodologies in NME Proceedings, 72 Fed. Reg. at 13,247–48; Huaiyin Foreign Trade Corp., 322 F.3d at 1372; see also Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588 (May 6, 1991) (final determination of sales at less than fair value), as modified by Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585 (May 2, 1994) (final determination of sales at less than fair value) (outlining the test Commerce applies to assess a company's independence from government control). Respondents who are unable to rebut the presumption of government control receive the NME country-wide rate.  See Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997); see also 19 C.F.R. § 351.107(d).

(a) Treatment of voluntary responses in countervailing or antidumping duty investigations and reviews

In any . . . review under section 1675(a) of this title in which [Commerce] has, under section 1677f-1(c)(2) of this title . . . , limited the number of exporters or producers examined, . . . [Commerce] shall establish . . . an individual weighted average dumping margin for any exporter or producer not initially selected for individual examination under such sections who submits to [Commerce] the information requested from exporters or producers selected for examination, if--

(1) such information is so submitted by the date specified--

(A)     for exporters and producers that were initially selected for examination, or

(B)     for the foreign government, in a countervailing duty case where [Commerce] has determined a single country-wide rate; and

(2) the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation.

19 U.S.C. § 1677m(a).  Thus, in limited reviews, Commerce must individually examine and calculate an antidumping duty rate for any respondent that timely provides Commerce with the information requested from the mandatory respondents, so long as the number of potential voluntary respondents "is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation." Id.

Here, Quoc Viet requested to be examined as a voluntary respondent as part of its request for Commerce to initiate an administrative review of the ADD Order. See Quoc Viet Request at 1.  On May 24, 2013, Commerce limited the number of respondents to be examined in this review, but deferred deciding whether to additionally review voluntary respondents until Commerce received the necessary information from all companies

wishing to be considered as a voluntary respondent.  See Respondent Selection Mem. at 8.  Quoc Viet timely furnished Commerce with its responses to the questionnaires issued to the mandatory respondents.  See generally Quoc Viet Voluntary Section A Response, PD 84–86 at bar code 3140545-01 (June 14, 2013); Quoc Viet Voluntary Section C Response, PD 113–14 at bar code 3145339-01 (Jul. 15, 2013); Quoc Viet Voluntary Section D Response, PD 117–18 at bar code 3146254-01 (Jul. 22, 2013).  Quoc Viet was the only company that had submitted such information and requested to be individually examined as a voluntary respondent.  See Voluntary Respondent Mem. at 1.  However, Commerce ultimately declined to individually examine Quoc Viet as a voluntary respondent.  See Final I&D Memo at 56–59; Voluntary Respondent Mem. at 1–4. Commerce's decision that additional examination of Quoc Viet would be unduly burdensome and inhibit timely completion of the review is reasonable.

While Congress seems to have keyed the need to examine a voluntary respondent based on the number of voluntary respondents in a given instance, it is unclear from the statutory language whether Commerce, in determining if it would be unduly burdened, must consider the number of respondents seeking individual examination as voluntary respondents in isolation or in the context of the review.  The Statement of Administrative Action, which was submitted contemporaneously with the implementation of the Uruguay Round Agreements Act and is instructive in discerning Congress's intent, suggests that Commerce may, under certain circumstances, refuse to examine any voluntary respondents regardless of the number of voluntary respondent requests alone.  Congress provided that

> [a]lthough Commerce . . . will not discourage voluntary responses and will endeavor to investigate all firms that voluntarily provide timely responses in the form required, in certain cases (including cases involving the same product from multiple countries) where the number of exporters or producers is particularly high, Commerce may decline to analyze voluntary responses because it would be unduly burdensome and would preclude the completion of timely investigations or reviews.

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ("SAA").   By recognizing certain cases where Commerce may decline to examine voluntary respondents based on considerations other than the number of requests, the SAA supports the view that the additional burden may be assessed in light of the complexity of the review.

Though Commerce only received a single voluntary respondent request from Quoc Viet, the court cannot say that Commerce's determination in this instance is unreasonable.  Congress has not expressed a baseline threshold of voluntary respondent requests for Commerce to claim it would be unduly burdened.  Treating the standard under 19 U.S.C. § 1677m(a) as such would be inappropriate given that what constitutes an undue burden varies from case to case based on Commerce's assessment of its resources.  As stated above, Congress envisioned circumstances where Commerce can refuse to examine any voluntary respondents regardless of the number of voluntary respondent requests.  See id.  As a result, it may be that the burdens implicated with reviewing a single potential voluntary respondent in combination with other significant administrative burdens could render individual review of that respondent unduly

burdensome.   Commerce's decision to decline to individually examine Quoc Viet is reasonable in light of the significant burdens it faced in this review.

Commerce has adequately explained why the significant burdens that the agency faced in this case made it such that even examining one additional respondent, Quoc Viet, would be unduly burdensome and inhibit timely completion of the review.   Commerce recognized that 19 U.S.C. § 1677m(a)(2) is a separate standard requiring it to make a separate determination from 19 U.S.C. § 1677f-1(c)(2).   See Final I&D Memo at 57. Commerce then identified numerous administrative burdens particular to this case that led to its decision.   Commerce first pointed to the burden of reviewing a new mandatory respondent.   See Voluntary Respondent Mem. at 2–3.   Commerce explained that

> in the seventh administrative review, the companies we selected for individual examination . . . had both been previously examined by the Department.   However, in the instant newly initiated eighth administrative review, the Department selected in addition to Minh Phu Group, a company the Department has never individually examined: Soc Trang Seafood Joint Stock Company ("Stapimex"), a company with multiple facilities for production, sales, and/or shrimp farming examination, which we anticipate will raise complex issues relating to vertical integration and corporate structure. . . .   [B]ecause we have never individually examined Stapimex's corporate structure, sales, and factors of production, the additional time and resources that we will need to devote to becoming familiar with this company render the review of a third company in this review unduly burdensome and would inhibit the timely completion of the review.

Id. (internal footnote omitted).   Commerce also added that "while the Minh Phu Group has been reviewed in most administrative reviews, as one of the largest exporters from Vietnam, its sales and factors of production processes are extremely complex and require significant time to thoroughly review, analyze and generate supplemental questionnaires and then to create the margin calculation programming for such an intricate company."

Id. at 3.  Commerce also identified the added burden caused by the number of separate

rate applicants.  See id.  Because a respondent is entitled to a separate rate in a NME

antidumping proceeding only if it can rebut the presumption of government control,

Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries:

Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,247–48 (Dep't

Commerce Mar. 21, 2007) (request for comment), Commerce anticipated the need to

expend additional resources to address "the added burden of issuing supplemental

questionnaires to any number of the companies seeking a separate rate."  Voluntary

Respondent Mem. at 3.   Further, Commerce intended to conduct two changed

circumstances reviews concurrently with the instant review.   See id.  Commerce

explained that "[i]n this case, of the 31 separate rate applicants for which we received

certification or applications, the Department has notified two of the companies requesting

a separate rate that they are required to undergo a changed circumstances review

because both companies reported changes in corporate and legal structure in the instant

review period."[18]   Id.  Commerce also noted that reviewing a voluntary respondent

required Commerce to issue multiple rounds of questionnaires and extensive examination

to accurately calculate a dumping margin, which Commerce believed impossible given its

limited resources.  See id. at 4.  In sum, Commerce determined that "[b]ecause the

Department intends to conduct the changed circumstances reviews, along with

---

[18] Although Commerce ultimately conducted a single changed circumstance review, see Certain
Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 79 Fed. Reg. 11,411 (Dep't
Commerce, Feb. 28, 2014) (final results of changed circumstances review), Commerce
anticipated that it needed to conduct two changed circumstance reviews at the time it declined to
review Quoc Viet as a voluntary respondent.

conducting the administrative review (which is expected to raise complex issues with

respect to the mandatory respondents), with the added burden of issuing supplemental

questionnaires to any number of the companies seeking a separate rate, an examination

of an additional voluntary respondent would be unduly burdensome and inhibit timely

completion of this administrative review." Id. at 3.

In the final results, Commerce maintained that reviewing Quoc Viet in addition to

the mandatory respondents would be unduly burdensome and inhibit timely completion

of the review.  See Final I&D Memo at 56–59.  Commerce based its decision on the

following:

> (1) [T]he complexity and details of the original and supplemental responses
> by MPG and Stapimex, (2) the large number of FOPs and other line items
> that required SVs, (3) the large number of separate-rate requests we
> received and analyzed, (4) conducting a changed circumstance review, and
> (5) the continuing level of workloads for other cases throughout this review
> as we described in the Respondent Selection Memo.

Id. at 58.  Commerce also noted that it had already fully extended the deadline for issuing

its preliminary results.  See id.  Specifically addressing examining Quoc Viet, Commerce

explained that its

> past experience with this case demonstrates that examining another
> company such as Quoc Viet would have required that the Department allot
> additional time and assign additional staff to analyze its responses (in
> addition to the staff completing its other casework within the statutory
> deadlines) at a level beyond the capacity of the Department's resources.

Id. at 59.  Thus, Commerce based its determination on the burdens implicated in

examining Quoc Viet in particular combined with the significant burdens Commerce faced

in this review.  Commerce explained why the sum of its administrative burdens created a

situation where the burden of reviewing a single voluntary respondent was one too many. Given the circumstances, Commerce reasonably concluded that "[a]ccepting Quoc Viet as a voluntary respondent, therefore, would have been unduly burdensome and inhibited . . . timely completion of the final results in this administrative review." Id.

Quoc Viet, however, contends that "Commerce's normal workload – even if significant – is not a sufficient basis for denying the statutorily mandatory voluntary respondent treatment for companies that otherwise satisfy the standards of the antidumping statute, and that Commerce, either must review a voluntary respondent or demonstrate that the burden . . . exceeds that presented in the typical antidumping review case." Quoc Viet Br. 13–14.  For support, Quoc Viet relies upon Grobest & I-Mei Industrial (Vietnam) Co. v. United States, 36 CIT __, 815 F. Supp. 2d 1342 (2012) ("Grobest I"); Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT __, 853 F. Supp. 2d 1352 (2012) ("Grobest II"); and Ad Hoc Shrimp Trade Action Comm. v. United States, 37 CIT __, 925 F. Supp. 2d 1367 (2013) ("Ad Hoc").   However, the court's decision that Commerce reasonably declined to individually examine Quoc Viet stands even in the face of these decisions.

The court in Grobest I made clear that Commerce cannot rely upon its determination to limit its examination of respondents pursuant to 19 U.S.C. § 1677f-1(c)(2) in deciding whether to decline to individually examine voluntary respondents pursuant to 19 U.S.C. § 1677m(a).  In other words, the court in Grobest I explained that 19 U.S.C. § 1677f-1(c)(2) and 19 U.S.C. § 1677m(a) required Commerce to make two separate determinations because the two statutory standards differ in that

19 U.S.C. § 1677m(a) "sets a higher threshold of agency burden before the requirement of individual review can be avoided." See Grobest I, 36 CIT at __, 815 F. Supp. 2d at 1363.   Commerce did not err in this regard and, as explained above, made an independent determination addressing the separate and distinct standard in 19 U.S.C. § 1677m(a). See Voluntary Respondent Mem. at 2–4; Final I&D Memo at 56–59.

Upon review of Commerce's remand redetermination following Grobest I, the court in Grobest II found Commerce did not satisfy the standard under 19 U.S.C. § 1677m(a) when it relied upon "the same burdens that occur in every review . . . , [which in effect] sets the bar for undue burden too low because it would make individual review of voluntary respondents in any typical antidumping or countervailing duty review unduly burdensome, and such a determination renders § 1677m(a) meaningless." Grobest II, 36 CIT at __, 853 F. Supp. 2d at 1364–65. Ad Hoc involved a separate proceeding where the court reaffirmed Grobest II's analysis of Commerce's obligation under the statutory standard, finding that Commerce's reason for declining to review a respondent seeking individual review was "merely the usual burden of conducting a thorough review, which is insufficient to satisfy § 1677m(a)'s standard of rejecting a voluntary respondent request." Ad Hoc, 37 CIT at __, 925 F. Supp. 2d at 1371–72. However, Commerce's determination here has given effect to 19 U.S.C. § 1677m(a) and has not rendered the statutory provision meaningless.   The court in Grobest II feared that accepting Commerce's explanation in that case would have eviscerated Commerce's statutory obligation to individually examine voluntary respondents.   Such concerns are not present here because Commerce fully assessed its available resources and determined that it was

impossible to allocate additional resources to examine Quoc Viet in light of Commerce's significant workload in the review.  Commerce spelled out each and every burden specific to this case that caused it to believe that it would be unduly burdensome to additionally review Quoc Viet in this case.

Quoc Viet relatedly claims that each of the grounds stated by Commerce is insufficient to amount to an undue burden.  <u>See</u> Quoc Viet Br. 15–18.  It may be that the grounds stated by Commerce in declining to review Quoc Viet are insufficient if viewed in isolation, however, it is reasonable for Commerce to conclude that these burdens taken together amount to an undue burden impeding its ability to timely complete the review. Quoc Viet additionally asserts that "these facts might be relevant to determine whether to limit the number of mandatory respondents under 19 U.S.C. § 1677f-1(c)(2), but the standard for denying review to voluntary respondents is different."  <u>Id.</u> at 18.  As explained above, the inquiry posed by 19 U.S.C. § 1677m(a) invites Commerce to assess whether the burden resulting from individually examining voluntary respondents would be undue or prevent timely completion of the review by considering the number of voluntary respondent requests combined with the administrative burdens already present in the proceeding.  Thus, Quoc Viet is correct in that the standard under 19 U.S.C. § 1677m(a) is distinct from 19 U.S.C. § 1677f-1(c)(2), however, Commerce's explanation sufficiently explains why additionally examining Quoc Viet amounted to an undue burden in this case.

Therefore, Commerce's decision to decline to review Quoc Viet as a voluntary respondent is reasonable.

**IV.     Commerce's Rejection of Quoc Viet's Margin Calculation Submissions and MPG's Case Brief is Reasonable and in Accordance With Law**

Both Quoc Viet and VASEP make separate claims that Commerce unlawfully rejected certain submissions for containing what it determined to be untimely filed new factual information.  See Quoc Viet Br. 19–25; VASEP Br. 10–16.

**A.     Quoc Viet's Margin Calculation Submissions**

Quoc Viet argues that Commerce erred in rejecting Quoc Viet's self-calculated antidumping duty margin from its March 28, April 7, and April 17, 2014 submissions as untimely filed new factual information because the underlying data for the calculations was already a part of the administrative record.  See Quoc Viet Br. 20.  Defendant argues that Commerce's determination was appropriate because Quoc Viet's margin calculation produced new data that was not previously on the record and was submitted well after the deadline for new factual information.  See Def.'s Resp. 38–45.  Commerce's rejection of Quoc Viet's submissions for containing untimely filed new factual information is reasonable and in accordance with law.

Commerce's regulations specify deadlines for when parties must submit factual information.  For reviews, any submission of factual information is due no later than "140 days after the last day of the anniversary month" of the antidumping duty order.  19 C.F.R. § 351.301(b)(2).[19]  Commerce's regulations also provide that "factual information" means

---

[19] The regulation in effect at the time of the proceeding provided the following time limit regarding the submission of factual information in an administrative review:

(footnote continued)

"(i) [i]nitial and supplemental questionnaire responses; (ii) [d]ata or statements of fact in support of allegations; (iii) [o]ther data or statements of facts; and (iv) [d]ocumentary evidence."[20]  19 C.F.R. § 351.102(b)(21).  Commerce's interpretation of what constitutes

---

(b) Time limits in general. Except as provided in paragraphs (c) and (d) of this section and § 351.302, a submission of factual information is due no later than:

. . .

> (2) For the final results of an administrative review, 140 days after the last day of the anniversary month, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed;

19 C.F.R. § 351.301(b)(2).

[20] Commerce subsequently modified the definition of factual information in its regulations:

> (21) Factual information.  "Factual information" means:

> (i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> (ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> (iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;

> (iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify, or correct such evidence placed on the record by the Department; and

> (v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

(footnote continued)

factual information in a given case is upheld unless an "'alternative reading is compelled by the regulation's plain language or by other indications of . . . .intent at the time of the regulation's promulgation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)); Torrington Co. v. United States, 156 F.3d 1361, 1363–64 (Fed. Cir. 1998).

Notwithstanding 19 C.F.R. § 351.301(b)(2), interested parties are permitted to submit factual information to rebut factual information submitted by another interested party "at any time prior to the deadline," or, "[i]f factual information is submitted less than 10 days before, on, or after (normally only with the Department's permission) the application deadline for submission of such factual information, . . . no later than 10 days after the date such factual information is served on the interested party." See 19 C.F.R. § 351.301(c)(1). When Commerce rejects factual information as untimely, it will not use such factual information in making any determination, nor will the official record include the filed document containing such factual information except for the sole purpose of "documenting the basis for rejecting the document." 19 C.F.R. § 351.104(a)(2).

Following the preliminary results, Quoc Viet submitted additional requests to be examined as a voluntary respondent on March 28, 2014 and April 7, 2014, both of which included a self-calculated antidumping duty margin based on its own sales of subject merchandise. See generally Quoc Viet Second Request for Individual Antidumping Duty

---

19 C.F.R. § 351.102(b)(21) (2015). However, this definition for factual information only applies to proceedings initiated on or after May 10, 2013. See Definition of Factual Information and Time Limits for Submission of Factual Information, 78 Fed. Reg. 21,246, 21,246 (Dep't Commerce Apr. 10, 2013). Because the instant review was commenced on March 29, 2013, the former version of the definition for factual information governs this case.

Rate and Margin Calculation Submission, CD 177 at bar code 3191334-01 (Mar. 28, 2014); Reiteration of Request for an Individual Antidumping Duty Rate for Quoc Viet, PD 212 at bar code 3194291-01 (Apr. 7, 2014).  Commerce rejected Quoc Viet's submissions because the self-calculated antidumping duty margin included untimely filed new factual information that was not on the administrative record and gave Quoc Viet an opportunity to redact the new factual information and resubmit the submission.  See Rejection of March 28, 2014 and April 7, 2014 Submissions, PD 215 at bar code 3196019-01 (Apr. 16, 2014).  In its resubmission, Quoc Viet noted that Commerce did not indicate what information was considered new factual information and redacted certain outputs in its margin calculation that it perceived might be considered new factual information.  See Quoc Viet Resubmission of Filings Deemed to Contain New Factual Information, PD 217 at bar code 3196261-01 (Apr. 17, 2014).  However, Commerce continued to find that the resubmission contained untimely new factual information even with the redactions and rejected the resubmitted margin calculations.  See Rejection of April 17, 2014 Submission at 1, PD 224 at bar code 3199060-01 (Apr. 30, 2014).[21]

Commerce reasonably rejected Quoc Viet's submissions for containing untimely filed new factual information.  With respect to the March 28 and April 7, 2014 submissions,

---

[21] Because Commerce inadvertently did not retain copies of the March 28, 2014 and April 7, 2014 submissions as required by 19 C.F.R. § 351.104(a)(2)(ii)(A), Quoc Viet resubmitted the documents on May 5, 2014 pursuant to Commerce's request and Commerce rejected that submission for containing untimely filed new factual information, retaining the rejected documents to demonstrate the basis for the rejection.  See Rejection of New Information from Quoc Viet Seaproducts Processing Trading and Import-Export Co., Ltd. at 1, PD 227 at bar code 3199892-01 (May 6, 2014); see also Quoc Viet Resubmission of Filings Deemed to Contain New Factual Information at 1–2, CD 180 at bar code 3199718-01 (May 5, 2014).

Commerce explained that "the submissions contained the new factual information consisting of margin calculations that [Quoc Viet] generated, which [Quoc Viet] submitted after the deadline for new factual information."  Rejection of March 28, 2014 and April 7, 2014 Submissions.  In its subsequent rejection of Quoc Viet's April 17, 2014 submission, Commerce further explained that the submission contained new factual information "which is both untimely and irrelevant."  Rejection of April 17, 2014 Submission at 1.  Quoc Viet's submissions were untimely for purposes of submitting new factual information because it made its submissions after the deadline for such information, July 18, 2013. See Final I&D Memo at 60; see also 19 C.F.R. § 351.301(b)(2).  Commerce therefore reasonably determined Quoc Viet's margin calculation submissions constituted data under 19 C.F.R. § 351.102(b)(21)(ii) that was not previously on the record and rejected the untimely submissions.

Quoc Viet disagrees that its margin calculation is new factual information because "all of the data incorporated into the SAS antidumping calculation (i.e., Quoc Viet's Section C sales data, Quoc Viet's Section D factors of production data, and Commerce's surrogate value data) . . . were already part of the administrative record."  Quoc Viet Br. 20.  Quoc Viet argues that Commerce's position is absurd because it would mean that "while the numbers '2' and '3' might be on the record, the result of adding those two numbers (i.e., 5) or of multiplying them (i.e., 6) constitutes 'new' factual information."  Id. However, Commerce found that Quoc Viet's submissions contained more than merely data already on the record but also "the outcome of running a SAS program is data . . . which had not previously existed on the record."  Final I&D Memo at 60.  Other than the

information from Quoc Viet's questionnaire responses, which were timely submitted and on the record, Quoc Viet's submissions included "1) a SAS program which contained company-specific adjustments rendering it different than the other SAS programs currently on the record; 2) a SAS log, and; 3) SAS output different than the SAS logs and outputs currently on the record." Rejection of April 17, 2014 Submission at 1. Quoc Viet's submissions manipulated the data and calculation program. Thus, the output of Quoc Viet's margin calculations no longer remained the sum or product of information that was already on the record as Quoc Viet contends.

Quoc Viet relatedly claims Commerce's interpretation of 19 C.F.R. § 351.102(b)(21) is irreconcilable with 19 U.S.C. § 1677m(g) because "[i]f the results of an antidumping margin calculation comprise new factual information, then every single final results of review where Commerce releases a SAS antidumping margin calculation disclosure would constitute factual information." Quoc Viet Br. 21. Quoc Viet argues that if "the outcome of running a SAS program is data within the meaning of 19 C.F.R. § 351.102(b)(21), and constitutes factual information, then Commerce should have allowed parties to comment on its own Final Results margin output calculations and programs under 19 U.S.C. § 1677m(g)." Id. at 22.

However, Commerce's interpretation of its regulatory definition for factual information does not conflict with the statutory provision that requires Commerce to afford interested parties an opportunity to comment on information obtained by Commerce. Section 1677m(g) provides that

> [i]nformation that is submitted on a timely basis to [Commerce] . . . during
> the course of a proceeding . . . shall be subject to comment by other parties
> . . . . [Commerce] . . . , before making a final determination . . . shall cease
> collecting information and shall provide the parties with a final opportunity
> to comment on the information obtained by [Commerce] . . . upon which the
> parties have not previously had an opportunity to comment.  Comments
> containing new factual information shall be disregarded.

19 U.S.C. § 1677m(g).  The statute requires that Commerce, "before making a final

determination . . . shall cease collecting information and shall provide the parties with a

final opportunity to comment on the information obtained by [Commerce] . . . upon which

the parties have not previously had an opportunity to comment."  19 U.S.C. § 1677m(g).

When Commerce calculates margins "it generates information; it *does not collect*

information."   Def.'s Resp. 41.   Quoc Viet argues that such a position creates the

conundrum that "when conducting the same SAS operations, Commerce does not

generate new facts, but Quoc Viet does."   Quoc Viet & Tri Union Reply 7.   Quoc Viet's

argument fails to recognize that the statute requires Commerce to provide an opportunity

to comment only on information it collects or obtains externally, not findings that it makes

or generates internally.   Quoc Viet's margin calculation submitted to Commerce triggers

this requirement, but Commerce's margin calculation does not. Commerce's

interpretation of factual information does not lead to the conclusion that its final

determination is subject to comment pursuant to 19 U.S.C. § 1677m(g).

Quoc Viet alternatively argues that its margin calculation submissions were

intended to rebut Commerce's findings in its preliminary results.  See Quoc Viet Br. 22–

25.  However, Commerce's preliminary determination does not contain new factual

information, but rather, contains its findings based on information that has been timely

submitted and placed on the record.  Additionally, Commerce's regulation permits the submission of new factual information to rebut information submitted by another interested party, not Commerce.  <u>See</u> 19 C.F.R. § 351.301(c)(1) (providing that "[a]ny interested party may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party"); <u>see also</u> Final I&D Memo at 61. "Interested party" does not include Commerce.  <u>See</u> 19 C.F.R. § 351.102(b)(29). Commerce is separately listed as "Administering authority" under 19 U.S.C. § 1677(1) and "Department" under 19 C.F.R. § 351.102(b)(15).  Moreover, Quoc Viet's margin calculations do not rebut the margins calculated for the mandatory respondents, but instead advance an alternative margin which Quoc Viet asserts accurately represents its pricing behavior.  Commerce stated that it "does not provide producers or exporters with authority to calculate or determine their own dumping margins based on information that is not being examined by the Department" and, as a result, Quoc Viet's margin calculation submission is not relevant for determining its dumping margin.  Rejection of April 17, 2014 Submission at 1.  Quoc Viet's submissions could not be characterized as rebutting Commerce's findings in the preliminary results because Commerce preliminarily determined the mandatory respondents' antidumping duty rates, not Quoc Viet's.

Thus, Quoc Viet is unable to persuade the court that Commerce unlawfully rejected its submissions as untimely filed new factual information.

### B.    MPG's Case Brief

VASEP argues that Commerce acted contrary to its regulations by rejecting MPG's case brief because "the citations and quotations that Commerce forced MPG to redact in

its case brief were not 'factual information' as defined by regulation, and therefore Commerce had no basis to force their redaction." VASEP Br. 11. Defendant argues that Commerce properly determined that MPG's case brief contained untimely filed new factual information because it included statements of fact and documentary evidence challenging Commerce's differential pricing analysis and was submitted after the deadline for new factual information. See Def.'s Resp. 45–51. Commerce reasonably rejected MPG's case brief for containing untimely filed new factual information in accordance with its regulations.

As stated above, Commerce's regulations specify that factual information during an administrative review must be submitted "140 days after the last day of the anniversary month" of the antidumping duty order. 19 C.F.R. § 351.301(b)(2). Commerce's regulations define "factual information" to include "(i) [i]nitial and supplemental questionnaire responses; (ii) [d]ata or statements of fact in support of allegations; (iii) [o]ther data or statements of facts; and (iv) [d]ocumentary evidence." 19 C.F.R. § 351.102(b)(21). Commerce's interpretation of what constitutes factual information in a given case is upheld unless an "'alternative reading is compelled by the regulation's plain language or by other indications of . . . .intent at the time of the regulation's promulgation.'" Thomas Jefferson Univ., 512 U.S. at 512 (quoting Gardebring, 485 U.S. at 430); Torrington Co., 156 F.3d at 1363–64.

On May 28, 2014, MPG submitted its case brief challenging several aspects of Commerce's differential pricing analysis. See generally Minh Phu Group's Case Brief. Commerce subsequently rejected MPG's case brief because it included citations to and

quotations from sources that were not on the administrative record, which Commerce considered untimely filed new factual information.  See Rejection of New Information in Case Brief at 1, PD 248 at bar code 3218413-01 (July 29, 2014).  MPG resubmitted its case brief making the demanded redactions under protest and requested that Commerce reconsider its overly broad stance on what constitutes factual information since the rejected information relates to mathematical logic rather than to the particular facts concerning the respondents.  See generally Resubmission of Minh Phu Group's Case Brief.

Commerce's rejection of MPG's case brief for containing untimely filed new factual information is reasonable and in accordance with law.  Commerce rejected MPG's case brief for containing "references [to] academic studies, textbooks, and website information referencing statistical analysis."  See Rejection of New Information in Case Brief at 1. Specifically, the case brief included "cites to an academic paper presented at the Annual Conference of British Educational Research Association, cites to a textbook from a professor at Rice University, and a 'Wiki' website, which are not on the record of this administrative review."  Rejection of New Information in Case Brief at 1.  The information was not previously submitted to the record and was provided to further support MPG's challenge to Commerce's differential pricing analysis.  The materials contain expert analysis that "clearly assumes the weight of evidence and, as such, amounts to [d]ata or statements of fact in support of allegations, i.e., factual information."  See PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 760–61 (Fed. Cir. 2012) (internal quotations omitted).  Categorizing these academic materials as factual information is not inconsistent

with the regulatory definition for such information.  Thus, Commerce's determination that the information constituted untimely filed new factual information is reasonable.

VASEP appears to concede that the rejected information includes facts, but nonetheless contends that the information does not fall within the meaning of "factual information" under 19 C.F.R. § 351.102(b)(21) because the context of the regulatory deadlines to submit such information "indicates that 'factual information' is intended to reference those facts that touch upon or involve the facts of the respondents themselves." VASEP Br. 12.  To support its contention, VASEP relies upon Commerce's revision to its definition for factual information, arguing that the purpose of a regulatory deadline to submit factual information is "to avoid circumstances where 'it is too late to adequately examine, analyze, conduct follow-up inquiries regarding and, if necessary, verify the information.'"  See id. at 12–13 (quoting Definition of Factual Information and Time Limits for Submission of Factual Information, 78 Fed. Reg. 21,246, 21,247 (Dep't Commerce Apr. 10, 2013) ("Definition Revision")).  VASEP claims that because "'[t]he administrative record of a given segment *is intended to reflect the specific facts for the period under review*,'" the information from MPG's case brief is not factual information as it does "not have any specific bearing on the respondents' own facts, whether in or outside the period of review."  Id. at 13 (quoting Definition Revision, 78 Fed. Reg. at 21,247).  Therefore, it is VASEP's position that the information Commerce demanded MPG to redact is not factual information because the information does "not have any specific bearing on the respondents' own facts" and therefore has "nothing to do with the *specific facts for the period of review*."  Id.

VASEP's argument is without merit.  As an initial matter, VASEP erroneously relies on information relating to revisions to the definition for factual information in Commerce's regulations.  Although Commerce's intent in promulgating a regulation is a relevant consideration in reviewing Commerce's actions pursuant to that regulation, see Thomas Jefferson Univ., 512 U.S. at 512, Commerce's intent in revising its definition for factual information is irrelevant in reviewing Commerce's determination that MPG's case brief included untimely filed new factual information according to the definition that governed this review.  The revised definition for factual information only applies to proceedings initiated on or after May 10, 2013.  See Definition Revision, 78 Fed. Reg. at 21,246.  Because the instant review was commenced on March 29, 2013, the former definition for factual information governs this case and the court's review.  Therefore, VASEP's argument that Commerce intended to limit factual information to information relating to the respondents is unpersuasive.

VASEP relatedly argues that the rejected information does not present the type of concern for which Commerce has established these deadlines because the information "at issue concerned facts of mathematical logic of a generally known character, the substance of which is not in serious dispute."  VASEP Br. 13.  Again, VASEP appears to concede that the information at issue is factual information.  More importantly, whether the information is generally known or not in serious dispute is irrelevant in determining whether the information is factual information for purposes of 19 C.F.R. § 351.102(b)(21) and 19 C.F.R. § 351.301.  Case briefs are limited to written arguments and a party cannot rely upon new factual information in making its arguments, even if it claims that the

information is generally known or not in serious dispute.  See 19 C.F.R. 351.309(c).  If

MPG wished to rely on academic studies, textbooks, and website information referencing

statistical analysis in making its arguments before Commerce, MPG was required to

adhere to the specified regulatory deadlines for submitting factual information.  MPG is

not excused from complying with Commerce's procedural requirements even if the

rejected information concerns facts of mathematical logic that are not in dispute.

VASEP next argues that the academic materials that MPG referenced and cited in

its case brief were indirectly relied upon by Commerce in its references to its previous

determination in an administrative review of certain activated carbon from the People's

Republic of China.  See VASEP Br. 13–14; see also Final I&D Memo at 30 n.111 (citing

and quoting Certain Activated Carbon from the People's Republic of China: Issues and

Decision Memorandum for the Final Results of the Fifth Antidumping Duty Administrative

Review at 25, A-570-904 (Nov. 20, 2013), available at

http://enforcement.trade.gov/frn/summary/prc/2013-28359-1.pdf (last visited Mar. 28,

2016) ("Activated Carbon")).  However, Commerce relied upon Activated Carbon to the

extent that it informed Commerce's most current practice of using its differential pricing

analysis.  Commerce's practice was informed in Activated Carbon by the very information

at issue here, but that information was timely submitted in that proceeding.  Commerce's

reliance upon previous determinations that have helped develop its practice of using its

differential pricing analysis does not, as a result, incorporate the sources or information

from the record of that proceeding to the instant review.  The fact remains that the sources

that MPG cited and referenced were not timely submitted here, which is precisely why

Commerce rejected certain portions of MPG's case brief.

VASEP asserts that Commerce previously accepted the information at issue as

part of MPG's pre-preliminary comments, which "suggests Commerce did not consider

them in the same light as 'factual information' defined by 19 C.F.R. § 351.102(b)(21)."

See VASEP Br. 14; see also Vietnam Respondents' Comments for the Preliminary

Results at 16–18 n.14–22, PD 180 at bar code 3173719-01 (Jan. 14, 2014) ("VASEP Pre-

Prelim. Comments").  VASEP's assertion is incorrect.  Though Commerce did not formally

reject MPG's pre-preliminary comments, Commerce expressly refused to consider the

citations and references to the academic materials contained in MPG's pre-preliminary

comments "[b]ecause these sources are not on the record."  Prelim. I&D Memo at 17.

Therefore, Commerce's decision that the information from MPG's case brief constituted

factual information is not contradicted by its treatment of MPG's pre-preliminary

comments.

VASEP additionally claims that Commerce abused its discretion by rejecting

MPG's case brief because "[i]t cannot rely upon factual information in support of its

position as articulated in the *Activated Carbon* Memo and then cause that factual

information to be redacted when relied upon by MPG."  VASEP Br. 15.  VASEP argues

that Commerce abused its discretion by not extending the deadline to submit new factual

information for good cause.  See id.  Commerce may, for good cause, extend the time

limit for submitting factual information unless expressly prohibited by statute.  See 19

C.F.R. § 351.302(b).  Commerce may extend the deadline "based upon its own

determination that there is good cause to do so or where an interested party shows good cause for such extension."  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,337 (Dep't Commerce May 19, 1997) (final rule).   In its request for reconsideration, MPG requested that Commerce "reconsider its decision and accept as filed the Minh Phu Group's original case brief."  Resubmission of Minh Phu Group's Case Brief at 3.  MPG did not request an extension.  See generally id.  Without a request for an extension, VASEP's argument must be taken as asserting that Commerce's failure to extend the deadline for interested parties to submit factual information on its own amounted to an abuse of discretion.

Commerce cannot be expected to extend its deadline in this case without a request from MPG.  Regarding its differential pricing analysis, Commerce stated that "[f]urther developments and changes, along with further refinements are expected in the context of its proceedings based upon an examination of the facts and the parties' comments in each case."  Prelim. I&D Memo at 16.  Commerce has announced to the public that it plans to further refine its approach as it gains more and more experience.  See Differential Pricing Analysis: Request for Comments, 79 Fed. Reg. 26,720, 26,722 (Dep't Commerce May 9, 2014) ("DPA Comment Request").  However, Commerce's willingness to further develop its differential pricing analysis is not an invitation to submit factual information at any time in the proceeding and does not mean that the deadlines to submit factual information to the record no longer apply.  Interested parties were afforded an opportunity to submit factual information to the record and comment on Commerce's practice during the proceeding.  While Commerce has made clear that it is open to comments during the

proceeding to inform its practice, it is not an abuse of discretion for Commerce to require that those comments be made in accordance with Commerce's regulatory procedures. Again, MPG could have requested an extension of the time limits, but failed to do so. It is hard to think of a reason why Commerce should be expected to *sua sponte* grant an extension of its deadlines given this context when MPG itself did not ask for one.

VASEP also claims that Commerce abused its discretion because "[i]f the object of submitted information is to inform a practice, the substance of which is not known until after the preliminary results are issued, and where Commerce has stated that it is in a constant state of development based on comments received not only in the instant proceeding but also external proceedings, the parties must have the ability to defend their interests." VASEP Br. 15–16. MPG was entitled to "'notice and a meaningful opportunity to be heard.'" PSC VSMPO-Avisma Corp., 688 F.3d at 761–62 (quoting LaChance v. Erickson, 522 U.S. 262, 266 (1998)). However, VASEP's assertion that MPG had no notice of Commerce's practice prior to the preliminary results and therefore had no opportunity to comment cannot withstand scrutiny. VASEP itself admits that MPG relied upon the academic paper presented at the Annual Conference of British Educational Research Association as well as an excerpt from textbook authored by a professor at Rice University in its pre-preliminary comments. See VASEP Br. 14; see also VASEP Pre-Prelim. Comments at 16–18 n.14–22. Commerce did not preclude MPG from relying upon academic support to present its arguments. Commerce merely required that MPG follow the regulatory requirements for submitting factual information to the administrative record. If MPG was unable to timely submit the information it wished to rely upon, it

should have demonstrated to Commerce that there was good cause to extend the deadline to submit such information.  Therefore, Commerce's decision to reject MPG's case brief for containing untimely filed new factual information is reasonable and not an abuse of discretion.[22]

## V.    Differential Pricing Analysis

VASEP raises several issues regarding Commerce's recently implemented differential pricing analysis and its subsequent decision to apply A-T in this review.  See VASEP Br. 26–44.  VASEP challenges Commerce's use of its differential pricing analysis in the final results claiming that Commerce failed to adequately explain (1) its change in practice from the Nails test to the differential pricing analysis that was applied here, see id. at 26–29; (2) specific aspects of its differential pricing analysis relating to its use of the Cohen's d test, see id. at 29–44; and (3) why A-T is applied to all sales if a respondent's differentially priced sales account for 66% or more of the total value of its domestic sales and to the differentially priced sales if those sales account for between 33% and 66% of the total value of the respondent's domestic sales.  See id. at 33–37.  Defendant argues

---

[22] On December 3, 2015, VASEP moved the court to take judicial notice of information from three sources in further support of its Rule 56.2 motion for judgment on the agency record, including two of the sources that MPG made references to in its case brief that Commerce had rejected as untimely filed new factual information.  See generally Consolidated Pls.' Mot. for Judicial Notice, Dec. 3, 2015, ECF No. 90.  The court denied VASEP's motion for judicial notice based on the standard under Rule 201 of the Federal Rules of Evidence and foundational principles of judicial review of an agency's determination.  See Tri Union Frozen Prods. Inc. v. United States, 40 CIT __, __, Slip Op. 16–20, at *4–12 (Mar. 7, 2016).  Because the court denied VASEP's motion for judicial notice and sustains Commerce's decision to reject MPG's case brief, the court has not considered the information from these sources that VASEP at times relies upon in making its arguments relating to Commerce's differential pricing analysis.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

in response that (1) VASEP has failed to exhaust its administrative remedies regarding Commerce's change in practice from the <u>Nails</u> test to the differential pricing analysis, <u>see</u> Def.'s Resp. 58–62, (2) Commerce's differential pricing analysis is permissible under the statute and is otherwise reasonable, <u>see</u> <u>id.</u> at 51–58, 62–73, 77–85, and (3) Commerce reasonably applied A-T after determining that the mandatory respondents' sales revealed a pattern of export prices that differ significantly among purchasers, regions, and periods of time.  <u>See</u> <u>id.</u> at 73–77.  Each of VASEP's arguments with respect to Commerce's differential pricing analysis are unavailing.  Commerce's determination is supported by substantial evidence and in accordance with law.

> ### A.     VASEP is Precluded From Arguing That Commerce Inadequately Explained its Change in Practice From the <u>Nails</u> Test to the Differential Pricing Analysis

VASEP claims that Commerce has inadequately explained its shift from its previous targeted dumping analysis to the current differential pricing analysis.[23]

---

[23] Commerce's methods for determining whether application of A-T is appropriate to uncover dumping has evolved over time.  <u>See generally</u> <u>Certain Pasta From Italy</u>, 61 Fed. Reg. 30,326 (Dep't Commerce June 14, 1996) (notice of final determination of sales at less than fair value), <u>as amended</u>, 61 Fed. Reg. 38,547 (Dep't Commerce June 14, 1996), <u>as amended</u> 61 Fed. Reg. 42,231 (Dep't Commerce Aug. 14, 1996); <u>Borden, Inc. v. United States</u>, 23 CIT 372 (1999), <u>rev'd on other grounds</u>, 7 Fed. Appx. 938 (Fed. Cir. 2001); <u>Coated Free Sheet Paper from the Republic of Korea</u>, 72 Fed. Reg. 60,630 (Dep't Commerce Oct. 25, 2007) (notice of final determination of sales at less than fair value).  In 2008, Commerce began using what is now known as the <u>Nails</u> test in investigations to determine if a foreign exporter or producer is engaging in targeted dumping.  <u>See generally</u> <u>Certain Steel Nails From the People's Republic of China</u>, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008) (final determination of sales at less than fair value); <u>Certain Steel Nails From the United Arab Emirates</u>, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008) (notice of final determination of sales at not less than fair value); <u>see also</u> <u>Mid Continent Nail Corp. v. United States</u>, 34 CIT 512, 513–15, 712 F. Supp. 2d 1370, 1372–74 (2010).  On

(footnote continued)

Specifically, it argues that "Commerce failed to provide any substantive explanation of why it abandoned" the Nails test.  VASEP Br. 28.  Defendant argues "VASEP did not raise this argument before the agency and, thus, has failed to exhaust its administrative remedies."  Def.'s Resp. 58.  Defendant additionally argues that "[i]n any event, Commerce provided appropriate explanations in the earlier cases in which it modified its practice, such as *Xanthan Gum*, as well as in its more recent request for additional comments in its *Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't of Commerce May 9, 2014) (Differential Pricing Comment Request)."  Id. at 61.  Because VASEP did not object to Commerce's change in practice before the agency, VASEP has failed to exhaust its administrative remedies.

The Court "shall, where appropriate, require the exhaustion of administrative remedies."  19 U.S.C. § 2637(d).  The exhaustion requirement is based on the principle "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003).  The court "takes a 'strict view' of the requirement that parties exhaust their administrative remedies before [Commerce] in trade cases."  Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  "Absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  Id.  Therefore, a litigant is

---

March 4, 2013, Commerce shifted its methodological approach and first used what it refers to as the "differential pricing analysis" in the antidumping duty investigation of xanthan gum from the People's Republic of China. See Xanthan Gum From the People's Republic of China, 78 Fed. Reg. 33,351, 33,351–52 (Dep't Commerce June 4, 2013) (final determination of sales at less than fair value).

required to avail itself of all available remedies at the administrative level as a precondition to judicial review.

Before Commerce, interested parties are afforded an opportunity to submit a case brief following the preliminary results to "present all arguments that continue . . . to be relevant to [Commerce's] final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R. § 351.309(c).  Failure to do so is a procedural defect that in effect abandons the argument and precludes raising the issue before the court.  Thus, interested parties generally must make all relevant arguments in their case brief for Commerce to consider and address in its final determination before it is appropriate for the court to review the contested determination, which is consistent with the overall purpose of the exhaustion doctrine of "allow[ing] the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review–advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency."  Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 88–90 (2006)).

Stapimex and MPG, both of which are individual member companies of VASEP, filed case briefs with Commerce after the preliminary results.  See generally Case Brief on behalf of Soc Trang Seafood Joint Stock Company ("Stapimex") and Separate Rate Respondents, PD 237 at bar code 3205034-01 (May 29, 2014) ("Stapimex Case Br."); Resubmission of Minh Phu Group's Case Brief.  Stapimex incorporated by reference MPG's arguments regarding Commerce's differential pricing analysis.  See Stapimex

Case Br. at 19.   MPG made numerous arguments in its case brief challenging the mechanics of Commerce's differential pricing analysis.[24]  All of the arguments in MPG's case brief relate to Commerce's withdrawal of its targeted dumping regulations and to the intricacies of the differential pricing analysis itself.   Nowhere in its case brief does MPG argue that Commerce has failed to adequately explain why it abandoned its previous targeted dumping analysis in favor of its differential pricing analysis.

VASEP failed to exhaust its remedies below.  VASEP raises the issue for the first time before the court that "Commerce provided no explanation when it shifted its methodology to the differential pricing analysis in this specific administrative review when it had previously applied the *Nails* test in the 7th administrative review of the same proceeding."  VASEP Br. 28.  Commerce did not first announce its change in practice in this review.  Commerce has been using its differential pricing analysis in investigations and reviews for some time now, including proceedings that were completed before Commerce had issued the preliminary results in this case.  See Prelim. I&D Memo at 16 n.72 (citing to recent antidumping duty investigations and reviews where Commerce has applied its new practice).   It was incumbent upon VASEP to object to Commerce's explanation for its change in practice or lack thereof at the administrative level after the

---

[24] Specifically, MPG argued in its case brief that Commerce (1) inadequately explained its withdrawal of the targeted dumping regulations (2) incorrectly ignored the t-test and the importance of statistical significance; (3) should make separate and distinct determinations for customer, region, and time period; (4) incorrectly considers absolute value in applying the Cohen's d test; (5) should use a higher threshold for sales to pass the Cohen's d test; (6) should not compare subgroups of a CONNUM; (7) incorrectly determines the pooled standard deviation based on a simple average; and (8) should limit application of A-T only to those transactions that are found to be differentially priced.  See Resubmission of Minh Phu Group's Case Brief at 1–36.

preliminary results.  MPG's case brief made clear that it objected to the mechanics of Commerce's differential pricing analysis, but did not put Commerce on notice of an objection to the change in practice itself.

VASEP contends that "[o]ne would expect Commerce, in addressing the multiple arguments concerning differential pricing raised by MPG . . . to explain its change to that practice from prior practice."  VASEP Br. 28–29 (internal citation omitted).  However, the adequacy of Commerce's explanation for its change in practice was not raised, either explicitly or implicitly, in MPG's case brief as VASEP contends.  "'Simple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*.'"  Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)).  Commerce was not given an opportunity here to address whether it has adequately explained its methodological shift to its differential pricing analysis.  Moreover, none of the exceptions to the exhaustion requirement apply here, nor does VASEP claim that any of the exceptions apply.  See Corus Staal BV, 502 F.3d at 1378–81 (providing exceptional situations where the court may choose not to enforce the exhaustion requirement, including when raising the argument before Commerce would be futile or when Commerce changes its position from the preliminary to the final determination).  Therefore, VASEP has not exhausted its administrative remedies by failing to raise the argument before Commerce.

   **B.      VASEP is Unable to Demonstrate That Commerce's Use of the Cohen's d Test to Identify Significant Price Differences in its Differential Pricing Analysis is Unreasonable**

VASEP next makes several specific challenges concerning the mechanics of Commerce's differential pricing analysis and in particular Commerce's Cohen's d test. See VASEP Br. 29–44.  VASEP prefaces its arguments by acknowledging that the statute, as implicated by Commerce's practice in reviews, is unclear regarding what constitutes a pattern of export prices that differ significantly and thus "Commerce has the discretion to fill the gap."  Id. at 29.  VASEP, however, argues that Commerce "does not have unbridled discretion to fill such gaps," id. at 39, and disagrees that Commerce's differential pricing analysis is entitled to deference because Commerce "fail[ed] to explain its actions."  Id. at 29.  Defendant argues that Commerce provided a more than adequate explanation for why its differential pricing analysis is reasonable.  See Def.'s Resp. 63 (citing Final I&D Memo at 17–35).

To determine whether merchandise is being sold in the United States at less than fair value and, if so, to calculate the antidumping duty rate for individually examined exporters and producers, Commerce compares normal value to the export price of each entry of subject merchandise.  See 19 U.S.C. §§ 1675(a)(1)(B), 1675(a)(2)(A), 1677(35)(A), 1677b(a).  Commerce shall ordinarily use A-A to calculate dumping margins in an investigation, but Commerce may use A-T as an alternative to the default A-A method if certain conditions are met.  See 19 U.S.C. § 1677f-1(d)(1)(A)–(B).  The statute permits application of A-T in an investigation to determine whether merchandise is being sold at less than fair value if:

(i)     there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii)    [Commerce] explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) [(A-A)] or (ii) [(T-T)].

19 U.S.C. § 1677f-1(d)(1)(B).

Congress, however, has not dictated which comparison methodology Commerce must use in administrative reviews, nor has Congress provided for when Commerce may use A-T in reviews.[25]  The Court of Appeals for the Federal Circuit nevertheless has held that Commerce has authority to apply A-T in a review.  See JBF RAK LLC v. United States, 790 F.3d 1358, 1362–65 (Fed. Cir. 2015) (affirming Commerce's decision to apply A-T in the context of an administrative review).

Although Commerce has authority to apply A-T in the context of an administrative review, see id., no statute or regulation directs Commerce when and how it may apply A-T.  Commerce's regulations provide that Commerce will apply A-A to calculate dumping margins in investigations and reviews unless another method is appropriate in a particular case, but do not provide further guidance regarding what those circumstances may be.[26]  See 19 C.F.R. § 351.414(c)(1).  Commerce has found the approach it has developed in

---

[25] The only guidance the statute provides with respect to Commerce's use of A-T in a review is that when applying A-T, Commerce "shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale."  19 U.S.C. § 1677f-1(d)(2).

[26] While a comparison of "the normal values of individual transactions to the export prices of individual transactions," ("T-T") is listed as a preferred method under 19 U.S.C. § 1677f-1(d)(1)(A), Commerce's regulations provide that the T-T methodology will rarely be employed by Commerce "such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).

investigations, namely the differential pricing analysis, to be instructive for determining

whether application of A-T is appropriate in a review.   See Antidumping Proceedings:

Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain

Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8,101, 8,102 (Dep't

Commerce Feb. 14, 2012) (announcing that Commerce intends to apply a comparison

methodology in reviews in a manner that parallels investigations).   In the preliminary

results, Commerce explained that

> [a]lthough [19 U.S.C. § 1677f-1(d)(1)(B)] does not strictly govern the
> Department's examination of this question in the context of administrative
> reviews, the Department finds that the issue arising under 19 CFR
> [§] 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue
> in antidumping duty investigations.   In recent investigations and reviews,
> the Department applied "differential pricing" analysis to determine whether
> application of A-T comparisons is appropriate in a particular situation
> pursuant to 19 CFR [§] 351.414(c)(1) and consistent with [19 U.S.C.
> § 1677f-1(d)(1)(B)].   The Department finds that the differential pricing
> analysis may be instructive for purposes of examining whether to apply an
> alternative comparison method in this administrative review.

Prelim. I&D Memo at 15–16 (internal footnotes omitted).   Therefore, as a matter of

practice, Commerce engages in the differential pricing analysis in administrative reviews

to determine whether application of A-T is appropriate.   According to that practice,

Commerce may use A-T rather than A-A in a review when (1) there is a pattern of export

prices that differ significantly among purchasers, regions, or periods of time and (2)

Commerce explains why the pattern of significant price differences cannot be taken into

account using A-A.   See id. at 16–17.   Commerce's practice first "requires a finding of a

pattern of [export prices] for comparable merchandise that differs significantly among

purchasers, regions or time periods."   Id. at 16.   The first stage of the differential pricing

analysis answers this question by bifurcating the inquiry using the Cohen's d test and a ratio test, i.e., separately addressing whether there are significant price differences and whether the extent of those significant price differences constitute a pattern. See id. at 16–17.

Commerce uses the Cohen's d test to evaluate whether "the net prices to a particular purchaser, region, or time period differ significantly from the net prices of all other sales of comparable merchandise."[27] Id. at 16. Commerce interprets the results of the Cohen's d test and determines whether a respondent's export prices differ significantly as follows:

> The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's d test: small, medium or large. Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the means of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference was considered significant, and the sales are considered to have passed the Cohen's d test, if the calculated Cohen's d coefficient is equal to or exceeds the large (i.e., 0.8) threshold.

---

[27] Commerce only conducts the Cohen's d test if: (1) the test group and its corresponding comparison group each have at least two transactions, and (2) the quantity of sales that make up the comparison group account for at least five percent of the total quantity of sales of comparable merchandise. See Prelim. I&D Memo at 16. Commerce performs the Cohen's d test by first calculating the difference between the weighted-average sales prices of a test group and its corresponding comparison group, and the extent of the difference between the sales prices of the two groups is then calculated by comparing the difference in relation to the price variances of the two groups. See Final I&D Memo at 28. The resulting value is referred to as the Cohen's d coefficient. See id. All of a respondent's sales for each CONNUM undergo several rounds of analysis to assess whether the export prices to a particular purchaser, region, or time period differ significantly from the export prices to all other purchasers, regions, or time periods. See, e.g., Analysis for the Preliminary Results for Minh Phu Group at 11–12, CD 161 at bar code 3188763-01 (Mar. 18, 2014); Analysis for the Preliminary Results of Soc Trang Seafood Joint Stock Company at 7–8, PD 204 at bar code 3189196-01 (Mar. 18, 2014); see also Final I&D Memo at 28–29 (explaining Commerce analyzes all sales in the Cohen's d test).

Id.  Thus, Commerce determines test group sales to pass the Cohen's d test if the resulting Cohen's d coefficient falls within the large threshold, i.e., equal to or greater than 0.8, which Commerce has found to be a strong indication of significant price differences. See id.  Conversely, Commerce views a Cohen's d coefficient value that falls within the small or medium thresholds, i.e., less than 0.8, as an indication that the price differences are not significant.  See id.  If the weighted-average sales price of a test group pass any of the rounds of the Cohen's d test, then all the sales within that test group are considered to have passed the Cohen's d test as a whole.  See, e.g., Analysis for the Preliminary Results for Minh Phu Group at 11–12, CD 161 at bar code 3188763-01 (Mar. 18, 2014) ("MPG Prelim. Analysis"); Analysis for the Preliminary Results of Soc Trang Seafood Joint Stock Company at 7–8, PD 204 at bar code 3189196-01 (Mar. 18, 2014) ("Stapimex Prelim. Analysis").  After Commerce uses the Cohen's d test, Commerce uses its ratio test to "assess[] the extent of the significant price differences for all sales as measured by the Cohen's d test."  Prelim. I&D Memo at 17.

In the ratio test, the individual results from the Cohen's d test are "aggregated for the producer or exporter as a whole to determine whether there exists a pattern of prices that differ significantly for that producer or exporter."  Final I&D Memo at 30.  Commerce described its assessment of the significant price differences as follows:

> If the value of sales to purchasers, regions, and time periods that pass the Cohen's d test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the A-T method to all sales as an alternative to the A-A method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's d test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results

> support consideration of the application of an A-T method to those sales
> identified as passing the Cohen's *d* test as an alternative to the A-A method,
> and application of the A-A method to those sales identified as not passing
> the Cohen's *d* test.  If 33 percent or less of the value of total sales passes
> the Cohen's *d* test, then the results of the Cohen's *d* test do not support
> consideration of an alternative to the A-A method.

Prelim. I&D Memo at 17.  Thus, the ratio test supports consideration of the application of

A-T if more than 33% of the value of total sales pass the Cohen's d test.  See id.

If the results of both the Cohen's d test and the ratio test support consideration of

the application of A-T, then Commerce proceeds to the second stage of the differential

pricing analysis.  See id.  In the second stage of the analysis, Commerce "examine[s]

whether using only the A-A method can appropriately account for such differences."  Id.

To that end, Commerce

> tests whether using an alternative method, based on the results of the
> Cohen's *d* and ratio test described above, yields a meaningful difference in
> the weighted average dumping margin as compared to that resulting from
> the use of the A-A method only.  If the difference between the two
> calculations is meaningful, this demonstrates that the A-A method cannot
> account for differences such as those observed in this analysis, and,
> therefore, an alternative method would be appropriate.  A difference in the
> weighted-average dumping margins is considered meaningful if (1) there is
> a 25 percent relative change in the weighted average dumping margin
> between the A-A method and the appropriate alternative method where both
> rates are above the de minimis threshold, or (2) the resulting weighted-
> average dumping margin moves across the de minimis threshold.

Id.  If these preconditions are met, Commerce finds that application of A-T is appropriate.

The court affords Commerce significant deference in determinations "involv[ing]

complex economic and accounting decisions of a technical nature."  Fujitsu Gen. Ltd. v.

United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996).  Commerce's methodological choice

for determining whether a respondent has engaged in a particular pricing behavior

warranting application of an alternative comparison methodology is precisely the type of determination where Commerce is afforded such discretion.  Despite this wide discretion, Commerce "must cogently explain why it has exercised its discretion in a given manner," Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983), and the methodological approach must nevertheless be a "reasonable means of effectuating the statutory purpose" and its conclusions must be supported by substantial evidence to be afforded deference.  Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987).    Under this rubric, the court must only address whether Commerce's methodological choice in carrying out its directive is reasonable.

Here, Commerce found that that the mandatory respondents' sales exhibited a pattern of export prices that differ significantly among purchasers, regions, and periods of time.  See Prelim. I&D Memo at 18–19.  After conducting the Cohen's d test and the ratio test, Commerce found that 63.4 percent of MPG's export sales and 69.4 percent of Stapimex's export sales confirmed the existence of a pattern of significant price differences among export prices for purchasers, regions, or time periods.  See MPG Prelim. Analysis at 11–12; Stapimex Prelim. Analysis at 7–8.  Commerce additionally determined that the A-A method cannot account for the pattern of significant price differences exhibited by the mandatory respondents' sales because there is a meaningful difference "[w]hen comparing the weighted-average dumping margins calculated using the standard average-to-average method for all U.S. sales and the appropriate alternative comparison method."  Prelim. I&D Memo at 18–19.  Thus, Commerce determined that

application of A-T was appropriate to calculate respondents' dumping margins in this review.  See id. at 19.  For MPG, the differential pricing analysis led Commerce to apply A-T only to the portion of MPG's domestic sales that exhibited a pattern of significant price differences and A-A to all of its other domestic sales.  See MPG Prelim. Analysis at 11–12; see also Prelim. I&D Memo at 19.  By contrast, the results of the differential pricing analysis led Commerce to apply A-T to all of Stapimex's U.S. sales.  See Stapimex Prelim. Analysis at 7–8; see also Prelim. I&D Memo at 19.  Commerce calculated weighted-average dumping margins of 9.75% for Stapimex applying A-T to all of its U.S. sales and 4.98% for MPG applying a combination of A-T and A-A, from which Commerce assigned a rate of 6.37% to separate rate respondents covered by the review.  See Stapimex Prelim. Analysis at 7–8; MPG Prelim. Analysis 11–12; Final Results, 79 Fed. Reg. at 57,049.

Commerce has sufficiently explained why its differential pricing analysis, specifically its use of the Cohen's d test to identify significant price differences, is reasonable.  See Prelim. I&D Memo at 15–17; Final I&D Memo at 27–33.  In explaining its decision to use the Cohen's d test, Commerce preliminarily noted that "there is nothing in the statute that mandates how the Department measures whether there is a pattern of prices that differs significantly."  Final I&D Memo at 27.  Commerce thus chose the Cohen's d test to measure price differences "to make use of a generally recognized measure of effect size in a practical analysis of an exporter's pricing data to make a determination the statute calls upon the Department to make."  Id. at 29.  Commerce explained that it uses the Cohen's d test for this purpose because "[t]he Cohen's d test is

a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group."  Prelim. I&D Memo at 16. Commerce further explained that "the Cohen's *d* test is a 'commonly used measure' to 'consider the difference between means in standardized units'" and is thus a "reasonable tool for use as part of an analysis to determine whether a pattern of prices differ significantly."  Final I&D Memo at 30.  For these reasons, Commerce stated that its "differential pricing analysis is reasonable, and the use of Cohen's *d* test as a component in this analysis is in no way contrary to the law."  Id. at 27.  Commerce's reasons for choosing the Cohen's d test suffice to explain why the test is able to identify and discern significant price differences.  Commerce's use of the Cohen's d test here is reasonable because its use identifies significant price differences.

VASEP's challenges to Commerce's use of the Cohen's d test in its differential pricing analysis fail. In particular, VASEP argues Commerce's use of the Cohen's d test is unlawful because it (1) lacks an additional test of statistical significance, see VASEP Br. 30, (2) uses arbitrary thresholds for determining whether sales pass the Cohen's d test, see id. at 30–34, (3) uses weighted-average export prices over prices of individual transactions to identify significant price differences, see id. at 33–35, (4) compares two subgroups of sales of a CONNUM[28] rather than a subgroup of sales to all sales of a CONNUM to identify significant price differences, see id. at 37–38, (5) includes both

---

[28] CONNUM is short for "control number" and is a numerical representation of a product consisting of a series of numbers reflecting characteristics of a product in the order of their importance used by Commerce to refer to particular merchandise.  See Prelim. I&D Memo at 16; Final I&D Memo at 6, 14.

higher-priced and lower-priced sales to identify significant price differences, see id. at 41–42, and (6) uses a pooled standard deviation derived from a simple average to identify significant price differences.   See id. at 43–44.   VASEP's specific challenges fail to demonstrate that Commerce's methodology runs afoul of the statute or is otherwise unreasonable.   Moreover, VASEP fails to put forth record evidence that demonstrates that in this case Commerce's use of the Cohen's d test is unable to reveal significant price differences or is otherwise unreasonable.

First, VASEP argues that Commerce was required to employ the use of a so-called t-test in conjunction with the Cohen's d test to ensure that the results are statistically significant.   See id. at 30.   However, there is no statutory provision that requires Commerce to make use of such an additional test, and Commerce adequately explained why it was not required to do so. Commerce explained that "[t]he statute does not require that the difference be 'statistically' significant, only that it be significant."   Final I&D Memo at 29.   Had Congress intended to impose upon Commerce a requirement to ensure statistical significance, "Congress presumably would have used language more precise than 'differ significantly.'"   Id.   Commerce explained that "[s]tatistical significance is used to evaluate whether the results of an analysis rises above sampling error (i.e., noise) present in the analysis and is dependent on the sampling technique and sample size." Id. at 28.   However, Commerce further explained that its "use of the Cohen's d test is based on the entire population of U.S. sales by each of the respondents, and, therefore, there are no estimates involved in the results and 'statistical significance' is not a relevant consideration."   Id. In support, Commerce points to the fact that "the Cohen's d coefficient

is calculated based on the means and variances of the test group and the comparison group," both of which "include all of the U.S. sales of comparable merchandise reported by the respondent." Id. Because Commerce's analyzes all sales in identifying significant price differences, "sampling technique, sample size, and statistical significance are not a relevant consideration in this context." Id. VASEP is unable to show why Commerce's refusal to employ an additional test of statistical significance is unreasonable here.

Second, VASEP argues that the thresholds Commerce uses for determining whether test group sales pass the Cohen's d test are arbitrary.[29] See VASEP Br. 30–34. VASEP asserts that the use of a 0.8 threshold to determine whether test group sales pass the Cohen's d test makes "it more likely than not that differential pricing will be found based on the application of Cohen's d" because, based on a normal distribution, "44% of observations . . . would . . . constitute sales with significant price differences." Id. at 31. In the final results, Commerce maintained that the thresholds it uses in the Cohen's d test are appropriate for purposes of identifying significant price differences. Commerce explained that these thresholds of "what constitutes a small effect size, medium effect size, and large effect size 'have been widely adopted.'" Final I&D Memo at 30. Commerce further explained that "[o]f these thresholds, the large threshold provides the strongest indication that there is a significant difference between the means of the test

---

[29] VASEP particularly relies upon information from documents that were not on the record before Commerce and that the court declined to take judicial notice of in arguing that Commerce's thresholds in the Cohen's d test are arbitrary. See, e.g., VASEP Br. 25–26, 30–31, 40–41. The court has not considered the information from these documents in its review of these thresholds. Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

and comparison groups, while the small threshold provides the weakest indication that such a difference exists."  Prelim. I&D Memo at 16.  Among these widely accepted thresholds, Commerce has chosen to use the largest and most demanding of the three to inform Commerce whether price differences are significant.  See id.  Commerce also emphasized that the statutory language does not indicate that some different or higher threshold must be used.  See Final I&D Memo at 29.  VASEP's argument assumes the mandatory respondents' sales data reflects a normal distribution and are not differentially priced, but "Commerce has never claimed that the United States sales prices in this review exhibit a normal distribution" and "has made no finding that United States prices tend to exhibit a normal distribution."  Def.'s Resp. 68–69.  VASEP has not pointed to any record evidence that suggests that the sales data analyzed here reflects such a price distribution.

VASEP relatedly claims that by using the 0.8 threshold Commerce's analysis reveals significant price differences where the difference is insignificant.  See VASEP Br. 31.  However, Commerce makes clear that the "the Cohen's *d* coefficient is calculated based on the means and variances of the test group and the comparison group."  Final I&D Memo at 28.  In other words, the 0.8 threshold combined with the variance, i.e., pooled standard deviation,[30] among the sales prices from the test group and the comparison group together determine whether the sales prices differ significantly.  See

---

[30] A pooled standard deviation is a composite value representing the variance between data sets, which in this case are the sales prices of the test group sales and the comparison group sales. See Final I&D Memo at 32–33.

Def.'s Resp. 69.  Commerce determines whether price differences are significant based upon the average price variation between the weighted-average sales prices of a CONNUM.   Thus, it is reasonably discernable from Commerce's explanation that the relative significance of the price differences is what matters, not the absolute differences. See Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (an agency's decision "of less than ideal clarity" may be upheld if the agency's path is reasonably discernible).

Third, VASEP takes issue with Commerce's use of weighted-average export prices as opposed to export prices of individual transactions in the Cohen's d test.  See VASEP Br. 33–35.   VASEP argues that "Commerce has not adequately explained why this methodology is consistent with either the statutory requirement that 'export prices,' not the mean of export prices, must differ significantly."  Id. at 35.  The language of the statute, as implicated by Commerce's practice, requires Commerce to determine if "there is a pattern of export prices . . . that differ significantly among purchasers regions, or periods of time."   19 U.S.C. § 1677f-1(d)(1)(B)(i).   Commerce has chosen to make this determination by using weighted-average export prices.  See Final I&D Memo at 28. Commerce's decision to use weighted-average export prices as opposed to prices of individual transactions is reasonable.   Neither the statute nor Commerce's practice of using its differential pricing analysis requires it to identify significant price differences through the use of individual export prices.  The test group is comprised of sales to a particular purchaser, region, or time period, and the corresponding comparison group is comprised of sales to all other purchasers, regions, or time periods.  See id. at 28, 32.

By basing its calculation "on the means and variances of the test group and the comparison group," id. at 28, Commerce reasonably determines whether the price differences between these two subgroups of sales are significant by evaluating the relative price differences between the two subgroups of sales.  It is discernable from Commerce's explanation that significant price differences between weighted-average of export prices reasonably indicate that individual export prices differ significantly.  VASEP claims that the use of weighted-average export prices "reflect[s] the overstatement of the incidence of differential pricing based on the inclusion in the mean for the subgroup of both sales at prices that differ significantly and those that do not."  VASEP Br. 35. However, to show that Commerce's use of weighted-average export prices was unreasonable here, VASEP must demonstrate that the use of weighted-averages finds significant price differences where such price differences would not be found as significant through the use of individual export prices.  Beyond conclusory statements, VASEP does not put forth any record evidence to suggest that the case here presents such a situation.

Fourth, VASEP argues that "Commerce has not explained how its decision to compare two subgroups of a CONNUM rather than a subgroup to the total sales of a particular CONNUM is consistent with the statutory purpose of the exercise."  Id. at 38. Commerce's explanation was clear and reasonable.  Before conducting the Cohen's d test, Commerce disaggregates the data collected from the individually examined respondents and sorts the sales of each CONNUM into sales to particular purchasers, regions, and periods of time.  See Prelim. I&D Memo at 16.  Each grouping of CONNUM

sales specific to a purchaser (or region or time period) forms a test group and the

remaining sales of that CONNUM to all other purchasers (or regions or time periods) form

a corresponding comparison group.  See Final I&D Memo at 28, 32.  Commerce explained

it disagreed

> that the sales in each test group should also be included in the comparison
> group rather than have the test and comparison groups be independent
> (i.e., mutually-exclusive) of each other.  This would result in purchasers',
> regions or time period's sale prices being compared to themselves.  [19
> U.S.C. § 1677f-1(d)(1)(B)(i)] states that there must exist a pattern of prices
> for comparable merchandise that differ significantly "among purchasers,
> regions, or periods of time."  It does not state between a purchaser, region
> and time period and all sales of the comparable merchandise.

Id. at 32.  For these reasons, Commerce "structured the Cohen's d test to compare the

mean price to a given purchaser, region or time period within the mean price to all other

purchasers, regions or time periods, respectively."  Id.

        The court finds this explanation to be adequate and reasonable because it is

arguably counterintuitive to include the potentially differentially priced sales in the base

group for purposes of evaluating whether the target group sales prices differ significantly.

VASEP might be able to make a different argument, but being able to do so does not

make Commerce's decision and explanation unreasonable.  VASEP, however, contends

that comparing two subgroups of a CONNUM "could yield the anomalous result that all

prices within a given CONNUM differ significantly in that all could pass the Cohen's d test

at above or below the 0.8 threshold."  VASEP Br. 38.  Commerce did not deny that such

result may occur, but explained that such a result is logical and not anomalous as VASEP

contends.  Thus, the possibility that all sales within a given CONNUM differ significantly

is not an unacceptable result.   VASEP again has not pointed to record evidence to suggest that comparing two subgroups of sales of a particular CONNUM is unreasonable here.

Fifth, VASEP asserts that Commerce has erroneously included higher-priced sales in determining whether the mandatory respondents' sales prices differ significantly.   See id. at 41–42.   VASEP grounds its argument in the belief that the objective of the statute "is limited to uncovering masked dumping resulting from prices that differ significantly." Id. at 42.   Commerce has adequately explained why it is reasonable to consider both higher-priced and lower-priced sales in its analysis.

To discern whether a respondent's export prices differ significantly among purchasers, regions, or time periods, Commerce has chosen to consider all sales. Commerce explained that "the statute does not require that the Department consider only lower priced sales" and "higher priced sales are equally capable as lower priced sales to create a pattern of prices that differ significantly."   Final I&D Memo at 31.   Commerce further explained that all sales are relevant to its analysis because "higher priced sales and lower priced sales do not operate independently; all sales are relevant to the analysis. Lower and higher priced sales could be dumped or could be masking other dumped sales."   Id.   Specifically, "higher priced sales will offset lower priced sales, either implicitly through the calculation of a weighted-average price or explicitly through the granting of offsets, that can mask dumping," and "[b]y considering all sales, higher priced and lower priced sales, the Department is able to analyze an exporter's pricing practice and to identify whether there is a pattern of prices that differ significantly."   Id.   Considering all

sales is not distortive.  Commerce's methodology is reasonable in this regard because considering all sales allows Commerce to fully assess the breadth of a respondent's price differences.  VASEP argues that Commerce's analysis should be limited to dumped sales that are hidden by significant price differences.  However, VASEP's argument is inapposite because the function of the Cohen's d test is to determine if a respondent's export sales prices differ significantly, not to identify dumped sales.  As Commerce stated, "[l]ower and higher priced sales could be dumped or could be masking other dumped sales—this is immaterial in the Cohen's $d$ test and in answering the question of whether there is a pattern of [export prices] that differ significantly because this analysis includes no comparisons with [normal values] and [19 U.S.C. § 1677f-1(d)(1)(B)(i)] contemplates no such comparisons."  Id.  Thus, VASEP misconstrues Commerce's analysis and is unable to demonstrate that Commerce has acted unreasonably by considering all sales to determine whether the mandatory respondents' sales were differentially priced.

Lastly, VASEP challenges Commerce's decision to base the variance between the means of the test group and the comparison group on a simple average rather than a weighted average given that the comparison group virtually always has more observations than the test group.  See VASEP Br. 43–44.  VASEP argues that "[b]y weighting the variances of the test and control groups equally, the likelihood of the test group passing Cohen's d is substantially increased because the test group is overweighed."  Id.  Commerce's decision to base the combined variance between the test group and the comparison group on a simple average is reasonable in this case.

Commerce makes its Cohen's d test calculation by first calculating the difference between the weighted-average sales prices of a test group and its corresponding comparison group.  See Final I&D Memo at 28.  Commerce determines the extent of the price difference between the sales prices of the test group and comparison group based upon the pooled standard deviation, which "quantifies the variations in . . . prices in each of the test and comparison groups."  Def.'s Resp. 69.  While the variance for each group is weight-averaged, Commerce uses a simple average to calculate the combined variance, also referred to as the pooled standard deviation.  See Final I&D Memo at 32–33.

> [T]here is no statutory directive with respect to how the Department should determine whether a pattern of prices that differ significantly exists, let alone how to calculate the pooled standard deviation of the Cohen's $d$ coefficient. The Department's intent is to rely on a reasonable approach that affords predictability.  The Department finds here that the best way to accomplish this goal is to use a simple average (i.e., giving equal weight to the test and comparison groups) when determining the pooled standard deviation.  By using a simple average, the respondent's pricing practices to each group will be weighted equally, and the magnitude of the sales to one group does not skew the outcome (although we note that within both the test group and comparison group, the Department uses weight averaging when calculating the variance for each group). . . . [W]e disagree . . . that the proper approach is to account for differences in the size of each group.

Id.  Commerce's decision to calculate the pooled standard deviation by using a simple average does not run afoul of any statutory provision and is reasonable on its face.

VASEP, however, argues that "when Commerce uses a straight average rather than a weighted average to determine the variance between the groups when applying Cohen's d, the analysis is biased in favor of finding that the test group passes Cohen's d."  VASEP Br. 43.  As support, VASEP provides a hypothetical example that it argues

illustrates how using a simple average skews the results in favor of finding differential pricing.  See id. at 43–44.  This argument is predicated on the assumption that a variance based on a simple average results in a smaller pooled standard deviation and a smaller denominator in the Cohen's d calculation, which would ultimately make it more likely that the test group sales would pass the Cohen's d test.  However, as Commerce explained, that result is not necessarily the case.  Commerce explained that the hypothetical "actually provides further support for the Department's use of a simple average" because "[i]f . . . the standard deviations are reversed between the test and comparison groups, the exact opposite result is derived."  Final I&D Memo at 33.  It is possible that there is a large price variance among the sales prices in the test group and thus a simple average would actually yield a larger pooled standard deviation, making it less likely that the test group sales would pass the Cohen's d test.  Moreover, VASEP also does not present record evidence to demonstrate that a pooled standard deviation based on a simple average is unreasonable here.

Before Commerce may apply A-T in a review, Commerce must first determine whether a respondent's sales reveal a pattern of export prices that differ significantly among purchasers, regions, or periods of time.  Commerce stated that "there is nothing in the statute that mandates how the Department measures whether there is a pattern of prices that differs significantly."  Final I&D Memo at 27.  Thus, according to its practice, Commerce uses the Cohen's d test to identify significant price differences.  As discussed above, the court finds Commerce's use of the Cohen's d test for this purpose to be reasonable here.  See State Farm, 463 U.S. at 48–49 ("[A]n agency must cogently explain

why it has exercised its discretion in a given manner."); Fujitsu Gen. Ltd., 88 F.3d at 1039

(granting Commerce significant deference in determinations "involv[ing] complex

economic and accounting decisions of a technical nature"); Ceramica Regiomontana,

S.A., 636 F. Supp. at 966, aff'd, 810 F.2d at 1139 (affording deference to Commerce's

methodology so long as it reasonably effectuates the statutory purpose and is supported

by substantial evidence).   Commerce has made clear that "[f]urther developments and

changes, along with further refinements are expected in the context of its proceeding

based upon an examination of the facts and the parties' comments in each case."  Final

I&D Memo at 28.   However, VASEP's arguments are unable to demonstrate that

Commerce's reliance on the Cohen's d test is unreasonable in this case.

### C.      VASEP is Unable to Demonstrate That Commerce's Application of A-T is Unreasonable

VASEP challenges how Commerce chose to apply A-T once it determined that the

application of A-T was appropriate here.   VASEP argues that Commerce has not

explained why it is reasonable for it to apply A-T to some of a respondent's sales, where

between 33% and 66% of the value of its sales pass the Cohen's d test, and A-T to all of

a respondent's sales, where more than 66% of the value of its sales pass the Cohen's d

test.  See VASEP Br. 33–37.  Defendant responds that Commerce's "measured, tiered

approach" for applying A-T is reasonable because there is no statutory provision that

specifies how Commerce is to apply A-T once the criteria for application of an alternative

methodology are satisfied. See Def.'s Resp. 73.  Further, Commerce explained it relied

upon its experience and expertise concerning the extent of patterns of prices that differ

significantly in developing the thresholds. <u>See</u> Prelim. I&D Memo at 17.  VASEP has offered no evidence to show that Commerce acted unreasonably in this case.

According to Commerce's practice, if a respondent's export sales exhibit a pattern of export prices that differ significantly among purchasers, regions, or time periods and that application of A-A cannot account for such differences, Commerce may choose to apply A-T to uncover dumping that may be masked by the pattern of significant price differences.  <u>See id.</u> at 16–17.  The results of the ratio test, which Commerce uses to "assess the extent of the significant price differences for all sales as measured by the Cohen's *d* test," dictate how Commerce will proceed to apply A-T to a particular respondent.  <u>See id.</u> at 17.  Commerce applies A-T to all of a respondent's export sales if the value of the sales passing the Cohen's d test accounts for at least 66% of the value of all sales and, conversely, Commerce applies A-T only to those sales passing the Cohen's d test and A-A to all other sales if the sales passing the Cohen's d test account for more than 33% but less than 66% of the value of all sales.  <u>See id.</u>

In situations involving complex and technical methodological choices, such as here, Commerce is given a wide level of discretion and the court need only address whether Commerce's methodological choice is reasonable.  <u>See</u> <u>State Farm</u>, 463 U.S. at 48–49 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); <u>Fujitsu Gen. Ltd.</u>, 88 F.3d at 1039 (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"); <u>Ceramica Regiomontana, S.A.</u>, 636 F. Supp. at 966, <u>aff'd</u>, 810 F.2d at 1139

(affording deference to Commerce's methodology so long as it reasonably effectuates the statutory purpose and is supported by substantial evidence).

Here, Commerce found that 63.4 percent of MPG's export sales and 69.4 percent of Stapimex's export sales confirmed the existence of a pattern of significant price differences among export prices for purchasers, regions, or time periods.  See MPG Prelim. Analysis at 11–12; Stapimex Prelim. Analysis at 7–8.  As a result, the differential pricing analysis led Commerce to apply A-T to all of Stapimex's U.S. sales.  See Stapimex Prelim. Analysis at 7–8; see also Prelim. I&D Memo at 19.  By contrast, the differential pricing analysis as applied to MPG led Commerce to apply A-T only to the portion of U.S. sales that exhibited a pattern of significant price differences and A-A to all of its other U.S. sales.[31]  See MPG Prelim. Analysis at 11–12; see also Prelim. I&D Memo at 19.

Commerce's use of the stated thresholds of 33% and 66% in determining whether to apply A-T and thereafter apply A-T to MPG's differentially priced sales and all of Stapimex's sales is reasonable.  Commerce explained its rationale behind its approach in the final results:

> When the criteria for application of the A-to-T method are satisfied, [19 U.S.C. § 1677f-1(d)(1)(B)] does not specify how to apply of the A-to-T method. . . . The Department finds that this approach is reasonable because whether, as an alternative methodology, the A-to-T comparison method is applied to all U.S. sales, a subset of U.S. sales, or no U.S. sales, depends on what proportion of U.S. sales pass the Cohen's *d* test.  Thus, there is a direct correlation between the U.S. sales that establish a pattern of prices

---

[31] VASEP and Defendant inadvertently state that Commerce applied A-T to all of MPG's sales. See, e.g., Def.'s Resp. 73; VASEP Reply 17.  The court notes, however, that Commerce applied A-T to all of Stapimex's sales, not MPG's sales.  See Stapimex Prelim. Analysis at 7-8. Commerce applied A-T to MPG's sales that Commerce found to be differentially priced and A-A to all of its other sales.  See Final I&D Memo at 33-35; MPG Prelim. Analysis at 11-12.

that differ significantly and to what portion of the U.S. sales the A-to-T comparison method is applied.

Final I&D Memo at 33–34.  Commerce's path is reasonably discernable.  Because Commerce is not directed how to apply A-T if it determines that application of A-T is appropriate, Commerce has fashioned a tiered approach to decide what degree application of A-T is appropriate dependent upon which threshold a respondent's pricing behavior falls under.  See id. at 33.

VASEP argues that "Commerce has not explained why it is using thresholds of 33% and 66% in its ratio test" for determining whether application of A-T is appropriate. See VASEP Br. 34.  However, Commerce has adequately explained that it is using these thresholds based upon its experience with analyzing pricing behaviors and identifying patterns of significant price differences.  See Prelim. I&D Memo at 17; Final I&D Memo at 33–34.  Based upon its experience and expertise in discerning pricing behaviors, Commerce has found that there is a correlation to the degree of differential pricing and the amount of masked dumping and has developed thresholds to reflect its understanding of that correlation.  If 33% or less of the value of all of a respondent's sales are found to have been differentially priced, Commerce views the pricing behavior within this threshold to fall short of constituting a pattern of significant price differences.  In a situation where a respondent's differentially priced sales account for between 33% and 66% of the value of all of its sales, Commerce finds that application of A-T is appropriate to uncover dumping masked by these sales but only to the differentially priced sales.  However, where a respondent's differentially priced sales account for more than 66% of the value

of all of its sales, Commerce views the extent of the pattern of significant price differences to be so pervasive as to warrant applying A-T to all of its export sales.  Thus, Commerce's approach applies A-T proportionate to the degree that a respondent has engaged in impermissible pricing behavior.  This discretionary application of A-T is reasonable and consistent with the underlying remedial purpose of the antidumping duty regime.  See Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1027 (Fed. Cir. 2007) ("The purpose of the antidumping statute is to prevent foreign goods from being sold at unfairly low prices in the United States to the injury of existing or potential United States producers.").  VASEP does not present any evidence that suggests Commerce's use of these thresholds is unreasonable here.

VASEP next argues that Commerce's thresholds are arbitrary.  Respondent Pls. VASEP and Individual VASEP Members' Reply Br. 18, Dec. 3, 2015, ECF No. 89 ("VASEP Reply").  VASEP specifically argues that "Commerce has never explained why when 65 percent of the allegedly targeted sales transactions meet the conditions for the exceptional method, the method should only be applied to the transactions that meet the exception, but when 67 percent meet the conditions the exceptional method must apply to all sales transactions."  Id.  However, such an argument is essentially an attack on thresholds in general.  The nature of a threshold is to treat two situations differently if they each fall on either side of the threshold, even if one is at the very edge of the threshold. That result is inherent in opting to employ the use of thresholds, but such a result is not automatically arbitrary or unreasonable.  Commerce's use of the thresholds here is reasonable so long as it offered a basis for the particular thresholds used, which it has.

VASEP makes much of the fact that Commerce has applied A-T to sales that it affirmatively determined were not differentially priced. Id. Commerce did find that a little over 30% of Stapimex's sales were not differentially priced. See Stapimex Prelim. Analysis at 7–8; see also Prelim. I&D Memo at 19. However, as explained above, Commerce determined that it is necessary to apply A-T to all sales to uncover dumping masked by the differentially priced sales in such situations despite the fact that all sales may not be differentially priced because of the extent of the respondent's impermissible pricing behavior. VASEP's argument does not show that the thresholds used by Commerce result in applying A-T where there is no pattern of export prices that differ significantly among purchasers, regions, or time periods.

VASEP argues that the statutory text is clear that A-A shall ordinarily apply and that the exceptional A-T method applies only if the criteria is met. See VASEP Reply 17–18. Thus, VASEP argues that Commerce was required to limit its application of A-T to the sales that were found to be differentially priced because, by testing all sales in the analysis, Commerce found that the other sales have not met the requirements for the exception. See id. The court does not agree. Commerce may apply A-T to a respondent if its export sales reveal a pattern of export prices that differ significantly among purchasers, regions, or time periods, and A-A cannot account for that pattern of significant price differences. There is no additional requirement that Commerce must limit its application of A-T only to those sales that contribute to the pattern of significant price differences. VASEP additionally claims that there was no "finding based on the facts of this record that the alleged targeting was so extensive or so pervasive that the exception

method is the only 'adequate yardstick.'" Id. at 18.  However, Commerce did make such

a finding.  Commerce found that Stapimex's sales were so extensively differentially priced

that application of A-T to all sales was appropriate given that more than 66% of its sales

were differentially priced.  Thus, VASEP's text-based argument cannot withstand scrutiny.

VASEP additionally argues that Commerce has not "explained the reason for its

shift from limiting application of the A-T methodology to only sales at prices found to differ

significantly (*Nails I*), to a practice which first (*Nails II*) applied the A-T methodology to all

sales, and now applies A-T to all sales if its analysis shows differential pricing above the

66% level." VASEP Br. 34.  Specifically, VASEP argues that Commerce has failed to

explain why its differential pricing analysis differs from the previous Nails test in that the

former "(1) determine[s] the existence of differential pricing based both on high and low

prices which purportedly differ significantly; (2) appl[ies] the ratio test to all sales within

CONNUMs passing the Cohen's d test above the mean; and (3) appl[ies] the A-T

methodology not only to sales above the mean of the CONNUMs passing Cohen's d but

also to all sales when the 66% threshold is met." Id. at 36–37.  This claim is part and

parcel of VASEP's argument that Commerce has failed to adequately explain its shift from

its previous targeted dumping analysis to its current differential pricing analysis, an

argument that VASEP failed to raise before Commerce and for which it failed to exhaust

its administrative remedies.   In any event, a claim that the previous Nails test is

inconsistent with Commerce's current differential pricing analysis does not preclude

Commerce from implementing its methodology.  Cf. GPX Int'l Tire Corp. v. United States,

33 CIT 1368, 1373, 645 F. Supp. 2d 1231, 1238 (2009) (citing United States v. Eurodif

S.A., 555 U.S. 305, 315 (2009)).  Thus, VASEP's argument that Commerce's current practice of applying A-T is inconsistent with its previous practice has no bearing on whether Commerce has applied A-T here is reasonable.

Therefore, VASEP fails to demonstrate that Commerce's thresholds and application of A-T are unreasonable based on the record of this case.

## VI.    VASEP is Precluded From Arguing That Commerce Misapplied the Bangladesh Inflator Index According to its Practice

VASEP claims that Commerce deviated from its practice because it failed to "convert U.S. denominated UN COMTRADE data to Bangladeshi taka prior to indexing for inflation using a Bangladeshi inflator."  VASEP Br. 45; see also MPG Final Analysis at Ex. 3.   In response, Defendant invokes the exhaustion doctrine.  See Def.'s Resp. 85. Defendant notes that Stapimex and MPG argued before Commerce that Commerce was required to apply the U.S. inflation rate to the UN Comtrade data rather than the Bangladeshi inflation rate.   See id. at 86; see also Stapimex Case Br. at 13–14; Resubmission of Minh Phu Group's Case Brief at 39–41.   However, Defendant argues that Stapimex and MPG did not raise the separate argument relating to the manner in which Commerce applied the Bangladeshi inflator index to the UN Comtrade, specifically that Commerce did not convert to taka prior to inflating the data.  See Def.'s Resp. 85– 86.  Defendant further provides that none of the exceptions to the exhaustion requirement apply and, "[c]onsequently, VASEP's claim should be denied under the exhaustion doctrine."  Id. at 88.

Under the exhaustion requirement, as explained above, a litigant must exhaust its administratively available remedies before the agency prior to judicial review of an agency determination.  See 19 U.S.C. § 2637(d); see also Consol. Bearings Co., 348 F.3d at 1003 ("[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."); Corus Staal BV, 502 F.3d at 1379.  Here, the prescribed administrative remedy is, following the preliminary results, to "present all arguments that continue . . . to be relevant to [Commerce's] final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R. § 351.309(c).  Thus, parties generally must first allow Commerce an opportunity to address any issues and cure errors in its determination prior to judicial review.  See Carpenter Tech. Corp., 30 CIT at 1374–75, 452 F. Supp. 2d at 1346 (citing Woodford, 548 U.S. at 88–90).

Before Commerce, Stapimex and MPG argued that Commerce did not follow its practice because it used a Bangladeshi inflator index to account for inflation for U.S. dollar denominated surrogate values derived from UN Comtrade data rather than using a U.S. inflator index.  See Stapimex Case Brief at 13–14; Resubmission of Minh Phu Group's Case Brief at 39–41; see also Final I&D Memo at 39–41.  In the final results, Commerce disagreed with Stapimex and MPG noting MPG and Stapimex mistakenly relied on a prior practice that had been discontinued.  See Final I&D Memo at 40–41.  Commerce explained that it reached its preliminary and final determinations based upon its current practice as established in an administrative review of certain small diameter carbon and

alloy seamless standard, line, and pressure pipe from Romania, which found that "'U.S. dollar-denominated surrogate values should be inflated based on the country in which the expense was incurred, not the currency in which it was reported.'"  Id. at 40 (quoting Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe From Romania, 70 Fed. Reg. 7,237 (Dep't Commerce Feb. 11, 2005) (final results of antidumping duty administrative review) and accompanying Issues and Decision Memorandum at Comment 7)).  Thus, Commerce concluded that it had in fact acted in accordance with its practice by applying the Bangladeshi inflator index to the U.S. denominated surrogate values and did not make any changes to its calculations.  See id. at 40–41.  Neither party raised any argument challenging Commerce's current practice.

Here, however, VASEP does not argue that Commerce used the wrong inflator index, but rather, argues that "Commerce did not as it claimed make the inflation adjustment consistent with its practice in Seamless Pipe from Romania."  VASEP Br. 45. Specifically, VASEP argues that Commerce misapplied the Bangladeshi inflator index to the U.S. denominated surrogate values even according to its current practice because "Commerce did not convert U.S. dollar-denominated UN COMTRADE data to Bangladeshi taka prior to indexing for inflation using a Bangladeshi inflator."  Id. Commerce was not given an opportunity to address the argument that it incorrectly applied the Bangladeshi inflator index to the surrogate values denominated in U.S. currency according to its current practice.

Moreover, none of the exceptions to the exhaustion requirement apply here.  See Corus Staal BV, 502 F.3d at 1378–81 (providing exceptional situations where the court

may choose not to enforce the exhaustion requirement, including when raising the argument before Commerce would be futile or when Commerce changes its position from the preliminary to the final determination).  Because VASEP failed to raise its objection regarding the manner in which Commerce applied the Bangladeshi inflator index, the court declines to consider the merits of VASEP's challenge.

## VII.    Request for Voluntary Remand on Labor Wage Rate

In the <u>Final Results</u>, Commerce, in accordance with its recent practice, used "industry-specific labor rates from the primary surrogate country."  Final I&D Memo at 47. Commerce was unable to use data from its preferred source, Chapter 6A from the International Labor Organization Yearbook of Labor Statistics, therefore, Commerce used data published by the Bangladesh Bureau of Statistics ("BBS") to value the FOP for labor. <u>See</u> <u>id.</u>  Ad Hoc Shrimp challenges Commerce's reliance on the BBS data because it claims the labor wage rate contained therein is aberrational due to labor abuses and thus is not representative of the Vietnamese shrimp industry.  <u>See</u> Ad Hoc Shrimp Br. 15–30. Specifically, Ad Hoc Shrimp argues that Commerce failed to explain why the BBS data was nonetheless reliable and non-distortive.  <u>See</u> <u>id.</u> at 23–24.  Thus, Ad Hoc Shrimp argues that Commerce's determination is unsupported by substantial evidence.  <u>See</u> <u>id.</u> at 29–30.

In response, Defendant requests a voluntary remand for Commerce to reconsider Ad Hoc Shrimp's specific arguments in connection with its challenge to Commerce's reliance on the BBS data to value the labor wage rate.  <u>See</u> Def.'s Resp. 88–89.  The court has discretion to grant such a request when Commerce wishes to reconsider its

previous position without confessing error.  SKF USA Inc. v. United States, 254 F.3d

1022, 1029 (Fed. Cir. 2001).  "Generally, a request for a voluntary remand due to

substantial and legitimate agency concerns should be granted."[32]  Timken Co. v. United

States, 38 CIT __, __, Slip Op. 14-51, *5 (May 2, 2014) (citing SKF USA Inc., 254 F.3d at

1029).  Commerce has substantial and legitimate concerns if (1) there is a compelling

justification for remand, (2) that justification is not outweighed by the need for finality, and

(3) the scope of the requested remand is appropriate.  Ad Hoc Shrimp Trade Action

Committee v. United States, 37 CIT __, __, 882 F. Supp. 2d 1377, 1381 (2013).

       Here, Defendant's request for voluntary remand satisfies the three-pronged test

and Commerce's concerns are substantial and legitimate.  First, a remand request for

Commerce to correct a potentially erroneous calculation of a dumping margin is a

compelling justification.  Baroque Timber Indus. (Zhongshan) Co. v. United States, 37

CIT __, __, 925 F. Supp. 2d 1332, 1339 (2013) (citing Parkdale Int'l v. United States, 475

F.3d 1375, 1380 (Fed. Cir. 2007)).  Second, the need for finality does not outweigh the

need to calculate accurate margins, especially in the context of an administrative review.

See id. at __, 925 F. Supp. 2d at 1338–39.  Moreover, Ad Hoc Shrimp supports

Defendant's request for voluntary remand and no other party has objected to Defendant's

request.  See Reply by Ad Hoc Shrimp Trade Action Committee to Def.'s Mem. Resp.

Pls.' Mots. J. Agency R. Under USCIT Rule 56.2 1, Dec. 3, 2015, ECF No. 88.  And third,

---

[32] Although the court may refuse to grant Commerce's request for remand if the request is frivolous or in bad faith, the court presumes Commerce to have acted in good faith unless there is evidence that suggests otherwise.  See Ad Hoc Shrimp Trade Action Committee v. United States, 37 CIT __, __, 882 F. Supp. 2d 1377, 1381 (2013).

the scope of Defendant's remand request—for Commerce to reconsider Ad Hoc Shrimp's arguments concerning Commerce's reliance on Bangladeshi labor wage rate data—is appropriate for this issue.  Accordingly, Defendant's remand request for Commerce to reconsider Ad Hoc Shrimp's arguments concerning the labor wage rate is based on a substantial and legitimate concern, and is therefore granted.

## CONCLUSION

The court grants Defendant's request for voluntary remand to Commerce to reconsider its use of the BBS data to value labor.  The court sustains the <u>Final Results</u> and <u>Amended Final Results</u> in all other respects.  In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's determination is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 45 days of this date; and it is further

**ORDERED** that Plaintiffs and Consolidated Plaintiffs shall have 30 days thereafter to file comments; and it is further

**ORDERED** that Defendant and Defendant-Intervenor shall have 15 days thereafter to file their replies to comments on the remand determination.


                                        <u> /s/ Claire R. Kelly  </u>
                                        Claire R. Kelly, Judge

Dated: April 6, 2016
        New York, New York